IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 6, 2009

Charles R. Fulbruge III
Clerk

No. 06-20885

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JEFFREY K SKILLING

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH and PRADO, Circuit Judges, and LUDLUM[*], District Judge.

PRADO, Circuit Judge:

A jury convicted former Enron Corporation CEO Jeffrey K. Skilling ("Skilling") for conspiracy, securities fraud, making false representations to auditors, and insider trading. Skilling argues that the government prosecuted him using an invalid legal theory, that the district court used erroneous jury instructions, that the jury was biased, that prosecutors engaged in unconstitutional misconduct, and that his sentence is improper. We affirm the convictions, vacate the sentence, and remand for resentencing.

I. Factual Background

[*] District Judge of the Western District of Texas, sitting by designation.

Skilling's rise at Enron began when he founded Enron's Wholesale business in 1990. In 1997, he became Enron's President and Chief Operating Officer and joined the Board of Directors. In February 2001, he became Enron's CEO, and on August 14, 2001, Skilling resigned from Enron.

About four months after Skilling's departure, Enron crashed into sudden bankruptcy. An initial investigation uncovered an elaborate conspiracy to deceive investors about the state of Enron's fiscal health. That conspiracy allegedly included overstating the company's financial situation for more than two years in an attempt to ensure that Enron's short-run stock price remained artificially high. With Congress looking on, the President appointed a team of investigators, the Enron Task Force. The investigation led to criminal charges against Skilling and many others.

According to the government, the conspiracy, led by Skilling and Ken Lay ("Lay"), Enron's CEO until Skilling took over (and again after his abrupt exit), worked to manipulate Enron's earnings to satisfy Wall Street's expectations. Other top Enron officials were key players in the unlawful scheme, including Richard Causey ("Causey"), the Chief Accounting Officer ("CAO"); Andrew Fastow ("Fastow"), the Chief Financial Officer ("CFO"); and Ben Glisan ("Glisan"), the Treasurer.

A.    Conspiracy and Securities Fraud

Several of Skilling's convictions stem from allegations of conspiracy and securities fraud. The government presented evidence that Skilling engaged in fraud in several of Enron's business endeavors. As an international, multi-billion dollar enterprise, Enron had elaborate financial dealings. At the time of its bankruptcy, the company was comprised of four major businesses: Wholesale, which bought and sold energy; Transportation and Distribution, which owned energy networks; Retail, or Enron Energy Services ("EES"), which sold energy to end-users; and Broadband, or Enron Broadband Services ("EBS"),

which bought and sold bandwidth capacity. The government alleged that Skilling took specific fraudulent actions with respect to Wholesale, EES, and EBS.

Wholesale, the most profitable division, accounted for nearly 90% of Enron's revenue. The government presented evidence to show that the conspirators lied about the nature of Wholesale, calling it a "logistics company," even though it was a much more economically volatile "trading company." Construing Wholesale as a "logistics company" had important ramifications for how investors valued the division. In fact, Skilling reportedly told Ken Rice ("Rice"), EBS's CEO, that if investors perceived Enron as a trading company, its stock would "get whacked." The alleged artifice also included masking the losses of Enron's other struggling subdivisions by shifting the losses to Wholesale. That made the struggling divisions appear financially sound and thus encouraged additional investment.

EES was a retail undertaking that Enron created to sell natural gas to customers in deregulated markets. Although Enron had high expectations for EES's profitability after its initial start-up period, EES did not meet these expectations. As of the fall of 2000, various utilities in California owed Enron substantial fees, which Enron had already booked as profits under its "mark-to-market accounting."[1] The utilities, however, were suffering heavy financial losses and stopped paying these fees. Under general accounting rules, Enron should have recorded a loss of hundreds of millions of dollars based on the failure of the utilities to pay the fees, but Skilling and his co-conspirators tried to hide the harm by transferring the losses to Wholesale so that EES would continue to show promise, at least on paper.

---

[1] This means that Enron immediately recognized income, discounted to present value, based on projected future earnings.

The government claims that Skilling hid EES's other problems as well. For example, in early 2001, EES employees allegedly realized that Enron was not properly valuing EES's contracts and that, again because of Enron's use of mark-to-market accounting, Enron would need to record a loss of many millions of dollars. Skilling allegedly told David Delainey, who was in charge of EES, to "bleed the contract issues over time" instead of recognizing the loss all at once.

Skilling again concealed EES's losses within Wholesale in late March 2001, after the California Public Utilities Commission decided to add a surcharge to electricity. Enron lost hundreds of millions of dollars as a result of this surcharge because, under its contracts, it could not pass the extra fees on to its customers. After Skilling was consulted and signed off, Enron shifted the EES losses to Wholesale by transfering EES's risk-management books to Wholesale. Business at EES did not improve, and by August 2001, when Skilling left Enron, EES had lost over $700 million in that year alone. Enron failed to account for these losses properly, making EES appear to be in better financial shape than it really was.

EBS was Enron's attempt to enter the telecommunications industry. Enron invested more than $1 billion in EBS, but lost money every quarter as EBS struggled to meet earnings targets. The government claims that in 2000, EBS managed to reach its earnings targets, but only by means of transactions afield from its core business (such as selling and monetizing corporate assets). Skilling allegedly hid from investors EBS's failure to meet earnings targets through core business activities.[2]

---

[2] The government claims that, in addition to being hidden, these non-core earnings were suspect in other ways. Many of them came from the sale of a portion of Enron's fiber optic network, commonly referred to as "dark fiber," to LJM2, a pseudo-third party that Fastow controlled. Allegedly, EBS also improperly hedged its investment in Avici, an internet company, in a Raptor Special Purpose Entity ("Raptor"). As discussed below, the Raptors arguably were instruments of fraud.

4

The government claims that Skilling knew EBS was struggling, at least based on its record of performance, but that he wanted to announce to the investing public that EBS was doing well and would do even better in 2001. Although EBS's executives said it was impossible, Skilling set EBS's earnings targets for 2001 to be a loss of only $65 million. EBS's personnel initially thought a loss estimate of nearly $500 million was more realistic, and, even with the best circumstances, they projected losses of at least $110 million. Rice, EBS's CEO, warned Skilling that the earnings targets for EBS were wrong, but Skilling apparently would not change them. Skilling told Rice that certain international assets were not producing sufficiently and that "we really need to hang in there for a year or two until EES and EBS could pick up the slack," because Enron "didn't need any more bad news."

In 2001, EBS was projected to lose $35 million in the first quarter, but Rice quickly realized that losses would actually be around $150 million. Skilling allegedly found out but would not budge on earnings targets, instead authorizing EBS to fire employees and engage in more non-core business to boost revenues. It worked for the first quarter, although Rice likened the monetizations to "one more hit of crack cocaine on these earnings." EBS faired a little better in the second quarter of 2001, reporting losses of approximately $100 million. Given that EBS continued to lose money, however, Enron decided to merge EBS into Wholesale. Ultimately, Enron lost the entire $1 billion that it had initially invested in EBS.

B.    False Representations About Enron's Finances

Many of the allegations of fraud also stem from Skilling's representations to investors about the financial standing of Wholesale, EES, and EBS. Skilling, as a high ranking corporate officer, held conference calls with investors to update them on the company's progress. The government claims that Skilling misled investors during these calls. For example, on January 22, 2001, Enron

released its earnings report for the previous quarter, and Skilling told investors that "the situation in California [regarding the utilities] had little impact on fourth quarter results. Let me repeat that. For Enron, the situation in California had little impact on fourth quarter results." Skilling also stated that "nothing can happen in California that would jeopardize" earnings targets.

However, when he made these statements, Skilling allegedly knew that the California utilities likely could not pay the fees that Enron was expecting and that Enron might have to write off a loss of hundreds of millions of dollars. He also listened silently as Mark Koenig ("Koenig"), Enron's Director of Investor Relations, assured investors that non-core business revenues were a "fairly small" amount of EBS's earnings, which the government alleges was not actually the case.[3]

Three days later, Skilling spoke at Enron's annual analysts conference, claiming that EES and EBS, like Enron's other major businesses, had "sustainable high earnings power." Skilling argues that this statement was merely harmless puffery. At the conference, he also reasserted that Wholesale was "not a trading business. We are a logistics company."

On March 23, 2001, Enron held a special conference call with analysts. Enron's stock price had been declining, and investors began surmising that EBS was having financial difficulties. Skilling comforted investors, saying that EBS was "having a great quarter" and that Enron was "highly confident" that EES would meet its earning target. According to the government, however, Skilling knew both divisions were in extreme financial turmoil.

On April 17, 2001, Skilling hosted another conference call in which he explained the transfer of EES's risk-management books to Wholesale by saying that there was "such capacity in our wholesale business that were—we just

---

[3] Koenig pleaded guilty to securities fraud for this statement, among others.

weren't taking advantage of that in managing our portfolio at the retail side. And this retail portfolio has gotten so big so fast that we needed to get the best—the best hands working on risk management there." In fact, the government claims that Skilling used the transfer to hide losses. Skilling also said that the "first quarter results were great" at EES, even though they were down substantially, and he again praised EBS, explaining that there was a "very strong development of the marketplace in the commoditization of bandwidth" and "we're feeling very good about the development of this business." Skilling was silent again while Rice and Koenig understated EBS's non-core revenues.

On July 17, 2001, Skilling told investors that EES "had an outstanding second quarter" and was "firmly on track to achieve" its earnings targets. That quarter alone, EES lost hundreds of millions of dollars. Skilling reiterated that the EES reorganization was based on a concern for management efficiency, while the government contends that the only purpose of the EES reorganization was to hide EES's losses.

C.     Manipulating Enron's Reserves

Skilling also allegedly committed fraud when he manipulated Enron's reserves to hit specific earnings targets in the fourth quarter of 1999, the second quarter of 2000, and the fourth quarter of 2000. Stock analysts made various projections regarding the earnings that Enron would announce each quarter, and the average of these estimates was known as the "consensus estimate." The government claims that Skilling was particularly committed to hitting or beating the consensus estimate. In January 2000, the consensus estimate for the fourth quarter of 1999 was earnings of 30¢ per share, which Enron could meet based on its earnings for that quarter. The day before the company was to announce its earnings, however, Koenig brought Skilling unwelcome news: the consensus estimate had jumped a penny per share. Skilling purportedly decided to

announce earnings high enough to reach the estimate, even though the increase was not merited by any change in Enron's underlying financial portrait.

Skilling allegedly took a similar unwarranted action at the end of the second quarter of 2000. At that time, the consensus estimate was 32¢ per share. A draft earnings report showed that Enron was going to announce earnings that met the estimate. Skilling, however, wanted to beat the consensus estimate by reporting 34¢ per share. To do that, he allegedly told Wholesale to increase its earnings by $7 million, and then by an additional $7 million. Wholesale acquiesced both times, reopening its books and adding $14 million from a reserve account that it had set aside to cover potential liabilities. The government claims that Enron did not have a business reason for using its reserves to increase Wholesale's earnings, instead doing so solely to exceed analysts' expectations.

The government contends that Skilling improperly used the reserve accounts again later that year. Wholesale's business was very profitable during the second half of 2000, and by late December it had placed over $850 million in reserves. The decision to put that money away was not based on feared future liabilities; instead, Wholesale set that money aside specifically to use in the event of an unfavorable consensus estimate. At the end of the fourth quarter, Skilling ordered that Enron recall some of that money to guarantee that Enron could announce a specific level of earnings.

D. Third-Party Entities LJM and LJM2

Another avenue of Skilling's alleged fraud came from his use of pseudo third-party entity LJM (and later LJM2) to improperly hedge its investments, doing so through four "secret" oral side deals. Fastow, Enron's CFO, proposed to Skilling and Causey that they create an entity to help Enron more easily meet market expectations. The impetus for creating LJM was the $200 million that Enron had received from an investment in a company called Rhythms Net.

Enron wanted to book that money, but it was possible that the value of the investment would drop, meaning that the asset's expected value would have to be reduced. By transferring the asset to a pseudo third-party, however, Enron could hedge its investment without needing to pay market rates for this hedging service. The government claims that LJM became that pseudo third-party. Enron contributed $234 million of its own shares in seed money to form LJM. Fastow, who was LJM's general partner, contributed $1 million, and outside investors contributed $15 million.

Enron encountered a potential problem, however, with using LJM to hedge its investments. Fastow faced a conflict of interest, because he was both Enron's CFO and LJM's general partner. Before Enron could sign a deal with LJM, Enron's code of conduct required the Office of the Chairman, which consisted of Skilling and Lay, to waive the conflict rules, and Enron would have to disclose this waiver in its Securities and Exchange Commission ("SEC") filings.[4] The Office of the Chairman granted the waiver, but allegedly not without first creating controversy within Enron's senior leadership.[5]

After forming LJM to hedge the Rhythms Net investment, Enron's first deal with LJM involved an interest in a Brazilian power plant, known as Cuiaba, that Enron sold to LJM in 1999. Enron was concerned that its South American unit would not meet its earnings targets, so it decided to sell its interest in

---

[4] Fastow purportedly explained to Enron's Board of Directors that Causey and Skilling reviewed all Enron/LJM transactions. Causey also told the Board that Enron's Office of the Chairman reviewed all of the deals. In November 2001, when Enron was on the precipice of demise, it told the SEC that it had approval for all of the allegedly fraudulent transactions.

[5] The Board of Directors was nervous that the media would find out, a so-called "Wall Street Journal risk." Many of Enron's managers objected as well, and Vince Kaminski, who was responsible for ensuring that Enron avoid taking unnecessary risks, complained. His objection was this: if both Rhythms Net's and Enron's stock lost value, then LJM could be undercapitalized, as the vast majority of its capital was Enron stock. Kaminski said that Skilling told him his group "acted more like cops, preventing people from executing transactions instead of helping them." After the LJM deal was approved, Skilling transferred Kaminski's group from Enron's Risk and Analytics Control group to Wholesale.

Cuiaba to obtain additional revenue. Initially, Enron tried to find a third party to buy the interest in Cuiaba, but was unsuccessful. Skilling, the government claims, then called Fastow and tried to sell Enron's interest in Cuiaba to LJM. Fastow at first was not interested; not only was the asset a bad investment, there was no time for due diligence. Skilling allegedly replied, "Don't worry. I'll make sure that you're all right on the project. You won't lose any money." That oral understanding did not appear in the deal write-up, and the accountants treated it as a real sale, even though, based on the alleged oral understanding between Skilling and Fastow, it was not a legitimate sale.

Enron eventually bought back the Cuiaba interest, paying full value (notwithstanding depreciation) plus 13%. Allegedly to camouflage the deal by avoiding round numbers, LJM received an extra $42,000 above the 13%. To allay further scrutiny, before Enron bought back the interest, Fastow apparently "sold" his interest in LJM to Michael Kopper ("Kopper"), a former Enron executive. That way, Enron did not need to describe the Cuiaba buyback as a transaction with a related party. For this to work, however, Skilling needed to honor his secret oral promise to Fastow that LJM would not lose money on the deal, despite Kopper becoming LJM's chief; the government claims that Skilling orally confirmed that he would do so.

The second allegedly fraudulent secret side deal between Enron and LJM involved the sale of Nigerian barges.[6] The government claims that in the waning days of 1999, LJM warehoused assets for Enron, allowing Enron to claim earnings during 1999 while it arranged for permanent buyers after the end of

---

[6] Around this time, LJM apparently was running out of capital, so Fastow raised nearly $400 million in capital and formed LJM2, another third-party entity that could conduct deals with Enron. In the fall of 2000, Fastow confided in Skilling that LJM2 was also stretched, and he proposed the creation of LJM3. The government claims that Skilling approved LJM3, saying to put "as much juice" as possible into it. LJM3, however, was never organized. For simplicity, we refer to all of these third-party entities throughout this opinion as "LJM," except where we quote directly from the parties' briefs or the record.

the year. With respect to the Nigerian barges deal, in late 1999, Enron sought to sell its interest in a group of barges anchored off the coast of Nigeria to meet an earnings target at the end of the quarter. Most investors were nervous about putting money into Nigeria, so Enron could not find a buyer.

Skilling allegedly called Fastow into his office and asked for LJM to buy the barges, again saying he would "make sure" that LJM would not lose money. Fastow initially was reluctant, because he was trying to raise money for LJM and did not want to scare off investors. However, he told Skilling that LJM would purchase the Nigerian barges if Enron could not find another investor within six months.

Fastow, on behalf of Enron, then arranged for Merrill Lynch to buy the Nigerian barges from Enron. Although Merrill Lynch did not really want to purchase the barges, Fastow purportedly made an oral "guarantee"—although he likely did not use that word—that Merrill Lynch would have to hold the barges for only six months in return for a risk-free profit. Because Merrill Lynch's investment was not at risk, the government alleges that Enron improperly treated the transaction as a sale and should not have recorded any earnings from the deal. At the end of the six months, Enron still could not find another buyer, so LJM purchased the interest from Merrill Lynch, apparently without even negotiating over price. Causey allegedly assured LJM that it would earn a guaranteed return on the deal, meaning that there was no transfer of risk to LJM. In sum, the government asserts that the sale of the Nigerian barges was not a true sale and that Enron improperly recognized earnings from the deal.

The third secret oral side deal involved the "Raptors," which were special purpose entities ("SPE") that would hedge assets for Enron, meaning that if the assets decreased in value, a Raptor would cover the difference—at least on paper. The government asserts that for Enron to validly hedge an asset, a third

party must own at least three percent of the SPE's equity, and that equity must be at risk. The government alleges that LJM acted as that "third party" even though it was not really a separate entity, agreeing to provide the equity that would be at risk.

The government contends that to fund the Raptors, LJM contributed $30 million and Enron spent $400 million of its own stock. Apparently, Fastow was at first against mixing LJM with the Raptors, but the government argues that Skilling convinced him through a "secret" side deal, whereby after funding the Raptors, LJM would recoup its $30 million and would receive an additional $11 million. To do this, Enron agreed to pay $41 million to the Raptors to purchase a "put"[7] on the stock Enron had contributed to the Raptors. The Raptors then transferred that $41 million to LJM. In return, the Raptors had to pay Enron if the price of the stock Enron used to capitalize the Raptors fell below a certain level.[8] LJM thus had nothing at risk; if the hedged assets dropped in value, the hedging Raptor, not LJM, was liable for the loss, and LJM recouped the capital it initially invested in the Raptors, along with an additional $11 million.

To make this transaction work, however, Enron's accountants had to sign off. Arthur Andersen, Enron's external auditor, approved the $41 million payment to LJM once it was described as a return "on" capital to LJM and not a return "of" capital. The auditors allegedly were not told that LJM and Enron did not haggle over the value of the hedged assets or that LJM was not actually a true third party. The government terms this entire deal—both Enron's "put"

---

[7] A "put" is an option contract that gives the holder the right to sell certain stock to the writer of the option at a specified price up to a specified date.

[8] The government alleges that by purchasing the "put," Enron was betting that its own stock price would drop, because the Raptor would have to pay Enron if the price of the stock dropped below a certain point. Skilling claims that the "put" was merely a self-insurance mechanism.

and LJM's return promise to allow Enron to hedge an asset at any value—the "quid pro quo."

The Raptors were also involved in other transactions. For example, in 2000, Enron hedged EBS's investment in Avici, an internet company, into one of the Raptors. That asset, at its highest value, was worth around $160 million, but the value was decreasing. Enron allegedly hedged the Avici interest with a Raptor at its highest value. The asset plummeted in value over the next few months, but because of the allegedly fraudulent hedge, Enron did not record the loss. Under the government's theory, Skilling knew all about the deceit and even told Fastow to "[k]eep it up." The alleged fraud continued throughout 2000. In fact, by the end of 2000, another one of the Raptors lost more than $100 million because of similar hedging. In total, Enron's use of the Raptors allegedly kept nearly $500 million in losses off of Enron's books in 2000.

The fourth "secret" side deal the government presented was "Global Galactic." Global Galactic was not actually a single deal but instead was the name that Fastow gave to the three-page handwritten list of his undocumented side deals with Enron. Fastow claimed that he created the list to keep track of the various deals and to ensure that he was on the same page as Enron's management on the substance of these deals. Skilling asserts that he had no connection to the deals on this list.

E.    False Representations to Auditors and Insider Trading

In addition to conspiracy and securities fraud, the jury also convicted Skilling for making false representations to auditors and insider trading. Skilling was required to sign Enron's SEC reports. The government claims that Skilling knew of the many false statements within Enron's SEC filings. For example, Enron characterized the money it obtained from selling the Cuiaba interest and from the Nigerian barges deal as legitimate income, when in fact these deals did not represent true sales. Likewise, although Enron had finalized

the terms of its buyback of the Cuiaba interest much earlier, Enron allegedly delayed the transaction so Fastow could sell his interest in LJM to Kopper, with the goal of allowing Enron to avoid disclosing the buyback as a related-party transaction in its SEC reports.

The government also claims that Enron kept Arthur Andersen in the dark about the false statements in its SEC filings. Skilling and other members of Enron's management were required to give Arthur Andersen certain management-representation letters, which actually contained known falsehoods, thus negating the validity of the audits. The assertedly false statements included claims that the auditors had access to all financial records and that Enron had disclosed all related-party transactions.

When Skilling resigned from Enron in August 2001, Enron's internal financial numbers were ghastly. On September 6, 2001, Skilling allegedly called his broker and tried to sell 200,000 shares of Enron stock. The sale did not go through, however, because the SEC still listed Skilling as an Enron "affiliate." This designation meant that the broker had to disclose the sale to the SEC and the public, which Skilling wished to avoid. Skilling allegedly told his broker to wait to complete the transaction until he obtained a letter from Enron saying that he was no longer a part of Enron's management.

Skilling sent that letter to his broker on September 10. Because of the terrorist attacks of September 11, Skilling was unable to sell his shares until September 17, the first day the markets reopened. He allegedly called his broker on that day, reiterated his order to sell, and told him he did not want the people at Enron to know about it. When Skilling testified before the SEC in December 2001, he stated that he sold the shares because he became "scared" after the September 11 attack and that "[t]here was no other reason other than September 11th that I sold the stock." The government contends that Skilling's testimony was a lie and that the sale amounted to insider trading.

14

## II. Trial and Sentence

According to the government, Skilling's conduct constitutes multiple instances of criminal activity. In July 2004, a grand jury returned a superseding indictment charging Skilling, Lay, and Causey with various counts of conspiracy, securities fraud, wire fraud, and insider trading. The indictment charged Skilling with one count of conspiracy to commit securities and wire fraud, fourteen counts of securities fraud, four counts of wire fraud, six counts of making false representations to auditors, and ten counts of insider trading. Several weeks before trial began, Causey pleaded guilty to one count of securities fraud, and the government dropped four counts against Skilling that involved Causey. Skilling and Lay went to trial, and, at the close of its case, the government eliminated four additional counts.

At trial, Skilling argued that he did not break any laws, that he was loyal to Enron, and that he consistently relied on competent legal and accounting advice; he characterized any falsehoods in his statements to analysts as immaterial in content and context. He also challenged the veracity of the government's witnesses, such as Fastow and Glisan. For example, Skilling claimed that Fastow's testimony regarding Skilling and Fastow's alleged shared understanding about Cuiaba and the Nigerian barges—"bear hugs," in Fastow's words—did not reflect what Skilling said but merely consisted of Fastow's misinterpretations. Skilling also questioned the validity of the so-called Global Galactic list.

In May 2006, the jury found Skilling guilty of nineteen counts: one count of conspiracy, twelve counts of securities fraud, five counts of making false statements, and one count of insider trading; the jury acquitted Skilling of nine counts of insider trading. The jury convicted Lay of every count against him.[9]

---

[9] On July 5, 2006, Lay died, causing the court to vacate his conviction and dismiss his indictment. United States v. Lay, 456 F. Supp. 2d 869, 870 (S.D. Tex. 2006).

The district court sentenced Skilling to 292 months' imprisonment, three years' supervised release, and $45 million in restitution.

### III. Honest-Services Fraud Allegation

On appeal, Skilling argues that we must reverse all of his convictions because the government used an invalid theory of "honest-services fraud" to convict him. The jury convicted Skilling of one count of conspiracy. The indictment and the government's theory allowed for three objects of the conspiracy: to commit (1) securities fraud, (2) wire fraud to deprive Enron and its shareholders of money and property, and (3) wire fraud to deprive Enron and its shareholders of the honest services owed by its employees. Because the jury returned a general verdict, we cannot know on which of the three objects it relied.

In Yates v. United States, 354 U.S. 298, 312 (1957), the Supreme Court held that where a jury returns a general verdict of guilt that might rest on multiple legal theories, at least one insufficient in law and the others sufficient, the verdict must be set aside. In such a situation, we cannot trust the jury to have chosen the legally sufficient theory and to have ignored the insufficient one, because "[j]urors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law." Griffin v. United States, 502 U.S. 46, 59 (1991).

In Yates, the defendant was charged with a single count of conspiracy with two objects: (1) to advocate the overthrow of the federal government and (2) to organize the Communist Party of the United States. Yates, 354 U.S. at 300. The "organize" object, however, was time-barred and thus legally insufficient. Id. at 304-11. The Court overturned the conviction, because it was not apparent whether the jury's verdict rested on the legally sufficient "advocate" object or the legally insufficient "organize" object. Id. at 312.

Likewise, if any of the three objects of Skilling's conspiracy offers a legally insufficient theory, we must set aside his conviction to avoid the possibility that the verdict rests on the insufficient theory.[10]   Skilling avers that the honest-services fraud object of the conspiracy count is legally insufficient, mandating the reversal of the conspiracy conviction.  He claims that this would also taint the convictions that rely upon the conspiracy count.  We review de novo whether a theory of conviction is legally insufficient.  United States v. Phillips, 219 F.3d 404, 409 (5th Cir. 2000) ("We review questions of law and application of statutes de novo.").

The honest-services statute provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  That is, the statute defines the "scheme or artifice to defraud" language found in the substantive mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, respectively, to include the substantive crime of depriving another of one's honest services.  Thus, wherever mail or wire fraud is an object of a conspiracy, there are two possible objects that can be charged:  use of the mails or wires to deprive another of (1) property or money or (2) honest services.  See 18 U.S.C. §§ 1341, 1343.

Although § 1346 defines "scheme or artifice to defraud," it offers no definition of "honest services."  Before the enactment of § 1346 in 1988, courts read the notion of honest services into the wire and mail fraud statutes.[11]  Both § 1341 and § 1343 read, "Whoever, having devised or intending to devise any

---

[10] The Supreme Court recently ruled that, on collateral review, an error of this type is subject to harmless error analysis, in which the "reviewing court finding such error should ask whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'"  See Hedgpeth v. Pulido, 129 S. Ct. 530, 530-31 (2008) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

[11] See McNally v. United States, 483 U.S. 350, 355, 358 (1987); United States v. Brumley, 116 F.3d 728, 731 (5th Cir. 1997) (en banc); see also United States v. Rybicki, 354 F.3d 124, 133 (2d Cir. 2003) (en banc).

scheme or artifice to defraud, or for obtaining money or property . . . ."  Courts read the disjunctive between "to defraud" and "for obtaining money or property" as indicating two separate objects of the scheme or artifice.  McNally v. United States, 483 U.S. 350, 358 (1987).  Money or property was one object, and courts construed "to defraud" to include schemes whose object was the deprivation of intangible rights such as honest services.  Id.

With McNally, the Supreme Court ended prosecution for honest-services fraud as a part of mail fraud.  Id. at 358-60.  The disjunctive phrase in the mail-fraud statute did not indicate that there were two objects of the fraud; rather, the Court "read § 1341 as limited in scope to the protection of property rights."  Id. at 360.  In response, Congress enacted § 1346, which this court and others have held was intended to overturn McNally with respect to the inclusion of the right to honest services under §§ 1341 and 1343 and to restore "the honest-services doctrine developed in the years leading up to McNally."  United States v. Brumley, 116 F.3d 728, 733 (5th Cir. 1997) (en banc); see also United States v. Rybicki, 354 F.3d 124, 136-37 (2d Cir. 2003) (en banc).  Thus, to determine what constituted "honest-services" fraud, we looked to our pre-McNally precedent and then set forth the rule for this circuit.  Brumley, 116 F.3d at 733-34 ("We decide today that services must be owed under state law and that the government must prove in a federal prosecution that they were in fact not delivered.").

In United States v. Gray, 96 F.3d 769 (5th Cir. 1996), we considered the honest-services statute in the context of a private employer and employees.  A jury convicted three assistant basketball coaches at Baylor University ("Baylor") of conspiracy to commit mail and wire fraud by depriving Baylor of its honest services through a scheme to obtain credits and scholarships for players in violation of National Collegiate Athletic Association ("NCAA") rules.  Id. at 772.  The coaches argued that honest-services fraud "improperly criminalize[d] mere

deceit," because the coaches had broken no law, only a private association's rules, and "they lacked the requisite intent to either harm the victims or to obtain personal benefit . . . . Essentially, [the coaches] argue[d] that their scheme was not intended to harm Baylor but rather to help Baylor by ensuring a successful basketball team." Id. at 774. We rejected the argument and noted

> that a breach of fiduciary duty of honesty or loyalty involving a violation of the duty to disclose could only result in criminal mail fraud where the information withheld from the employer was material and that, where the employer was in the private sector, information should be deemed material if the employee had reason to believe the information would lead a reasonable employer to change its business conduct.

Id. at 774-75 (quoting United States v. Ballard, 680 F.2d 352, 353 (Former 5th Cir. 1982) (per curiam) (on petition for rehearing)). We concluded that the information the coaches withheld, namely that they were cheating, was material; had Baylor been aware of their actions, it undoubtedly would have changed its business conduct by recruiting players who satisfied NCAA requirements. Id. at 775. In light of our conclusions, the coaches' conspiracy to violate NCAA rules was a federal crime; that their intent was to help rather than harm the university was of no consequence. Id. at 774-75.

In United States v. Brown, 459 F.3d 509 (5th Cir. 2006), we again addressed honest-services fraud and refined our jurisprudence. The defendants[12] arranged for the Nigerian barges deal we described above, whereby Enron "sold" three energy-producing barges to Merrill Lynch. Id. at 513. The "purchase" allowed Enron to book, as earnings, the money it received from Merrill Lynch, thereby helping Enron meet its earnings targets. Id. at 513-16. In return, Enron assured Merrill Lynch a fixed rate of return on the

---

[12] The government tried two Enron employees and four Merrill Lynch employees. Brown, 459 F.3d at 513-14. The jury acquitted one Enron employee and convicted the other five defendants; only the Merrill Lynch employees appealed. Id.

19

investment—a flat fee—and promised that Enron or a third party would repurchase the barges within six months. Id. Such an agreement, however, would have rendered the deal a loan from Merrill Lynch to Enron, because Merrill Lynch had no equity at stake. Id. As a loan, the transaction could have no positive impact on Enron's earnings, meaning that it was fraudulent for Enron to book any earnings from the deal. Id.

After surveying our prior honest-services jurisprudence, we reversed the defendants' convictions, concluding that their conduct did not fall within the bounds of the honest-services statute. Id. at 523. In particular, we held that

> where an employer intentionally aligns the interests of the employee with a specified corporate goal, where the employee perceives his pursuit of that goal as mutually benefitting him and his employer, and where the employee's conduct is consistent with that perception of the mutual interest, such conduct is beyond the reach of the honest-services theory of fraud as it has hitherto been applied.

Id. at 522. Importantly, we expounded upon our understanding of honest-services fraud by providing a crucial distinction from the facts in Gray:

> Gray is distinguishable both factually and legally. Gray is dissimilar to this case in part because the opinion recognizes nothing akin to Enron's corporate incentive policy coupled with senior executive support for the deal (the deal was sanctioned by Fastow, Enron's Chief Financial Officer), which together created an understanding that Enron had a corporate interest in, and was a willing beneficiary of, the scheme. The opinion in Gray presents only the coaches' own belief that their scheme benefitted the university; no one or any authority outside the cadre of coaches encouraged, approved, or even knew of the wrongdoing.

Id. at 522 n.13. Given the gloss this passage places on Gray, we can distill the holding in Brown to be the following: when an employer (1) creates a particular goal, (2) aligns the employees' interests with the employer's interest in achieving that goal, and (3) has higher-level management sanction improper conduct to reach the goal, then lower-level employees following their boss's direction are not

liable for honest-services fraud. Thus, we reversed the convictions of the employees in Brown because they were acting both in the corporate interest and at the direction of their employer. Id. at 522. In essence, Brown created an exception for honest-services fraud where an employer not only aligns its interests with the interests of its employees but also sanctions the fraudulent conduct, i.e., where the corporate decisionmakers, who supervised the employees being prosecuted, specifically authorized the activity.

Skilling does not contest that he owed Enron a fiduciary duty. Instead, he contends that his conduct did not breach that duty, because his fraud was in the corporate interest and therefore was not self-dealing. In particular, Skilling asserts that he did not engage in his conduct in secret. Skilling further latches onto our discussion in Brown regarding corporate interest and contends that his actions were not fraudulent because he acted in pursuit of Enron's goals of achieving a higher stock price.

If this were the correct reading of Brown, that decision would be in irreconcilable conflict with Gray, which binds us, as the basketball coaches in Gray acted pursuant to their employer's interest of having a winning basketball team. "When two panel opinions appear in conflict, it is the earlier which controls," Harvey v. Blake, 913 F.2d 226, 228 n.2 (5th Cir. 1990), as "one panel of this court cannot overrule the decision of another panel," United States v. Darrington, 351 F.3d 632, 634 (5th Cir. 2003).

Skilling misconstrues our holding in Brown, however, because he fails to recognize the manner in which the court in Brown explicitly distinguished Gray. As we noted above, Gray and Brown present different facts; in Gray, the basketball coaches acted on their own volition, without any direction from their supervisors, while in Brown, a lower-level Enron employee acted at the direction of Fastow, who as a decisionmaker had the authority to tell his employee that Enron sanctioned the particular fraud in question. See Gray, 96 F.3d at 775; see

21

also Brown, 459 F.3d at 522 & n.13. The difference is that in Brown, the employee undertook the specific fraud in question at the direction of the employer, while this did not occur in Gray. In essence, because the Enron decisionmaker in Brown sanctioned the specific fraudulent conduct of its employee, the employee (and the other conspirators) did not deprive Enron of its honest services. Thus, for example, had the basketball coaches in Gray showed that the President of Baylor University or other decisionmakers specifically directed their fraudulent conduct, then they would not have been liable for honest-services fraud.

Applying this rule, Skilling's convictions must stand. First, Enron created a goal of meeting certain earnings projections. Second, Enron aligned its interests with Skilling's personal interests, e.g., through his compensation structure, leading Skilling to undertake fraudulent means to achieve the goal. Third—and fatally to Skilling's argument—no one at Enron sanctioned Skilling's improper conduct. That is, Skilling does not allege that the Board of Directors or any other decisionmaker specifically directed the improper means that he undertook to achieve his goals. Of course, a senior executive cannot wear his "executive" hat to sanction a fraudulent scheme and then wear his "employee" hat to perpetuate that fraud. Therefore, it is not a matter of Skilling setting the corporation's policy himself. Instead, the question is whether anyone who supervised Skilling specifically directed his actions—such as how Fastow sanctioned the scheme in Brown. Skilling never alleged that he engaged in his conduct at the explicit direction of anyone, and therefore he cannot avail himself of the exception from Brown.

That the Board of Directors approved several of the fraudulent transactions is of no moment.[13] Tacitly approving a sale is not the same as

---

[13] Additionally, there is no evidence that the Board of Directors approved of the secret side deals between Skilling and Fastow.

having senior executives direct their lower-level employees to engage in fraudulent conduct. Skilling reads a requirement of secrecy into the holding in Brown, asserting that it is not honest-services fraud if the employer knows of the fraud in question. This argument is unavailing, for two reasons. First, a requirement of secrecy (or lack thereof) does not appear in Brown. Second, it makes no difference that the Board of Directors knew of Skilling's conduct if Enron (through the Board or its senior executives) did not actually direct Skilling to undertake the fraudulent means to achieve his goals.

The elements of honest-services wire fraud applicable here are (1) a material breach of a fiduciary duty imposed under state law,[14] including duties defined by the employer-employee relationship,[15] (2) that results in a detriment to the employer.[16] Brown sheds light on the employer-employee relationship by creating an exception for when the employer specifically directs the fraudulent conduct. Further, it is a sufficient detriment for an employee, contrary to his duty of honesty, to withhold material information, i.e., information that he had reason to believe would lead a reasonable employer to change its conduct.[17] Accordingly, the jury was entitled to convict Skilling of conspiracy to commit honest-services wire fraud on these elements. Thus, although we do not know on which alleged object of the conspiracy the jury based its verdict, there is no

---

[14] See Brumley, 116 F.3d at 734; United States v. Ballard, 663 F.2d 534, 541 (Former 5th Cir. Dec. 1981) (original panel opinion).

[15] See United States v. Caldwell, 302 F.3d 399, 409 (5th Cir. 2002); Brumley, 116 F.3d at 734.

[16] See Ballard, 663 F.2d at 540.

[17] See id. at 540-41; see also Gray, 96 F.3d at 774-75 (quoting Ballard, 680 F.2d at 353).

risk that Skilling was convicted of conspiracy based on a legally insufficient theory, and the jury was entitled to convict on any or all of the three objects.[18]

## IV. Jury Instructions

Skilling raises four alleged errors arising from either the instructions that the district court gave to the jury or Skilling's proposed instructions that the court rejected. Specifically, Skilling asserts that the district court improperly (1) instructed the jury on "deliberate ignorance," (2) denied the jury adequate guidance on the legal meaning of "materiality" in the context of the charges against him, (3) denied his proposed "side deal" instruction, and (4) denied his proposed "good faith" instruction.

In assessing a jury instruction, we consider whether it is a "correct statement of the law," United States v. Pompa, 434 F.3d 800, 805 (5th Cir. 2005) (internal quotation marks omitted), whether it "clearly instructs jurors," id., and whether it is "factually supportable," United States v. Mendoza-Medina, 346 F.3d 121, 132 (5th Cir. 2003) ("[T]he court may not instruct the jury on a charge that is not supported by evidence.") (internal quotation marks omitted). We review for abuse of discretion and, in deciding whether the evidence reasonably supports the charge, we construe the evidence in the light most favorable to the government. United States v. Fuchs, 467 F.3d 889, 901 (5th Cir. 2006) (citing cases), cert. denied, 127 S. Ct. 1502 (2007). Additionally, we afford the district court "substantial latitude in formulating the charge." United States v. Pettigrew, 77 F.3d 1500, 1510 (5th Cir. 1996). A district court's error in giving the jury instructions is subject to harmless error review. United States v. Edelkind, 525 F.3d 388, 397 (5th Cir.), cert. denied, 129 S. Ct. 246 (2008); United

---

[18] Because Skilling's conspiracy conviction is legally sound, the so-called Pinkerton instruction, see Pinkerton v. United States, 328 U.S. 640 (1946), was appropriate, and the jury was entitled to convict Skilling of the other substantive counts based on the actions of his co-conspirators.

States v. Ibarra-Zelaya, 465 F.3d 596, 607 (5th Cir. 2006), cert. denied, 127 S. Ct. 992, and cert. denied, 127 S. Ct. 3056, and cert. denied, 127 S. Ct. 3056 (2007).

Moreover, a court's rejection of a proposed jury instruction constitutes "reversible error only where the requested instruction is substantially correct; the actual charge given the jury did not substantially cover the content of the proposed instruction; and where the omission of the proposed instruction would 'seriously impair the defendant's ability to present a defense.'" United States v. Loe, 248 F.3d 449, 459 (5th Cir. 2001) (quoting Pettigrew, 77 F.3d at 1510).

A.    Deliberate Ignorance

Skilling claims that the district court erred in giving a "deliberate ignorance" instruction. The instruction, borrowed verbatim from Fifth Circuit Pattern Instruction 1.37, informed jurors that they could infer a defendant's knowledge of facts from evidence that he was deliberately ignorant of such facts.[19] Skilling objected to the instruction and argues that the evidence did not support it.

"Deliberate ignorance" amounts to a half-step between the highest mens rea standard of "knowledge" and the lower standards of "recklessness" and "negligence." It "'denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be

---

[19] The instruction stated,

The word "knowingly," as that term is used throughout these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

caught.'" United States v. Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990) (quoting United States v. Restrepo-Granda, 575 F.2d 524, 528 (5th Cir. 1978)). Thus, we have noted that "[t]he key aspect of deliberate ignorance is the conscious action of the defendant—the defendant [must have] consciously attempted to escape confirmation of conditions or events he strongly suspected to exist." Id. In simplest terms, deliberate ignorance is reflected in a criminal defendant's actions that suggest, in effect, "Don't tell me, I don't want to know." Id. (citing United States v. de Luna, 815 F.2d 301, 302 (5th Cir. 1987)). The instruction's purpose "is to inform the jury that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." Id.

Although we have frequently upheld the use of deliberate ignorance instructions, we have just as frequently warned of a risk inherent in them:

> Because the instruction permits a jury to convict a defendant without a finding that the defendant was actually aware of the existence of illegal conduct, the deliberate ignorance instruction poses the risk that a jury might convict the defendant on a lesser negligence standardSSthe defendant should have been aware of the illegal conduct.

Id. The source of this risk is the potential for confusion about the degree of "deliberateness" required to convert ordinary, innocent ignorance into guilty knowledge. The concern is that once a jury learns that it can convict a defendant despite evidence of a lack of knowledge, it will be misled into thinking that it can convict based on negligent or reckless ignorance rather than intentional ignorance. In other words, the jury may erroneously apply a lesser mens rea requirement: a "should have known" standard of knowledge.

In light of that concern, a district court should give the deliberate ignorance instruction only in the "rare" instance where there is significant evidence of deliberate ignorance. Id. "[T]he district court should not instruct the

jury on deliberate ignorance when the evidence raises only the inferences that the defendant had actual knowledge or no knowledge at all of the facts in question." Id. Rather, for the instruction to be warranted, "[t]he evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." Lara-Velasquez, 919 F.2d at 951. Thus, where there is no such evidence, a district court should not give the instruction because there is no basis for finding deliberate ignorance. In such a case, it is usually harmful, because it is likely to lead the jury to find that the defendant had the requisite knowledge when he in fact did not. Cf. Lara-Velasquez, 919 F.2d at 951 (describing the risk inherent in the deliberate ignorance instruction).

For example, in United States v. Ojebode, 957 F.2d 1218, 1229 (5th Cir. 1992), we reversed a conviction for illegally importing heroin into the United States based on an improper deliberate ignorance instruction. The defendant carried drugs on a flight from Germany to Mexico that happened to have a layover in Houston, and he was arrested with the drugs during the layover. Id. at 1221-22. He argued that he did not knowingly bring the heroin into the United States because he did not know the flight stopped in Houston. Id. at 1223-24.

The district court gave a deliberate ignorance instruction, and the defendant was convicted. Id. at 1229. We reversed, because there was no evidence that the defendant had "tried to avoid learning of the flight's scheduled landing in Houston," "refused to view the posted flight schedule[,] or absented himself from places where he would be likely to learn of his Lufthansa Flight's likely stops." Id. In other words, there was no purposeful contrivance to avoid learning of a relevant fact, so there was insufficient evidence of deliberate ignorance. Id. The instruction therefore posed too great a risk that the jury

27

would convict for his negligent ignorance—i.e., that he should have known where the flight was headed. See id.

Skilling argues that there was no evidence that he was deliberately ignorant of any illegal acts. Rather, he claims that he "never denied knowledge of the relevant underlying acts," and that at trial he asserted only that those acts were not illegal. He claims that he "agreed" at trial with the government's characterization of him as knowing everything that went on at Enron. He maintains that his "defense was not that he was unaware of fraud, but that there was no fraud." Because his knowledge of allegedly illegal actions was never in dispute, he claims that "[n]either side argued [he] subjectively suspected criminal behavior but purposely contrived to avoid learning about it."[20]

Even if Skilling is correct that there is little evidence to support a deliberate ignorance instruction, however, any error in the district court's decision to give the instruction was harmless. This is because the peril to be avoided in cases reversing convictions based on the deliberate ignorance instruction is not present here. By his own admission, Skilling claims that he knew of the allegedly illegal acts, so there is no risk that a jury would rely on the deliberate ignorance instruction to find that he should have known of the acts. Consequently, even if the district court erred in giving the deliberate ignorance instruction in the sense that the instruction was "not supported by evidence," Mendoza-Medina, 346 F.3d at 132 (internal quotation marks omitted), any such error was necessarily harmless,[21] as we have repeatedly deemed deliberate

---

[20] Skilling also asserts in his reply brief that "[t]here were very few instances where [he] denied that the alleged conduct happened—he agreed statements were made, conversations occurred, transactions were approved. Indeed, most were a matter of written record. [His] position was that the conduct was not criminal or wrongful."

[21] In his reply brief, Skilling suggests we must reverse for any errors regarding deliberate ignorance instructions because they are per se prejudicial. He points to two decisions from this circuit that reversed convictions without discussion of prejudice. In the first, the court did not explicitly find prejudice but, in reversing the defendant's convictions for

ignorance instructions harmless where there is "substantial evidence of actual knowledge." United States v. Threadgill, 172 F.3d 357, 369 (5th Cir. 1999) (internal quotation marks omitted).[22]

Perhaps recognizing that difficulty, Skilling frames the harmfully misleading effect of the deliberate ignorance instruction as a concern that "the jury may well have decided [Skilling] should have known the transactions were fraudulent or merely should have known they were bad business decisions." In so arguing, Skilling conflates the requisite mental state for the allegedly fraudulent acts ("knowingly") with the requisite mental state for the fraud as a whole ("willfully and with the intent to defraud").[23]

conspiracy to import heroin and importation of heroin, held that in addition to giving an improper deliberate ignorance instruction, the court committed reversible error by failing to properly instruct the jury on the scienter element of those offenses. Ojebode, 957 F.2d at 1228-29. In the second case, we also did not explicitly find prejudice but did consider the deliberate ignorance error in combination with various other errors, declaring, "[i]n light of the above discussed erroneous evidentiary rulings and jury instructions, however, we VACATE . . . ." United States v. Cavin, 39 F.3d 1299, 1311 (5th Cir. 1994). Because harmless error analysis applies to erroneous deliberate ignorance instructions, see infra note 22, we read these two cases as making implicit findings of prejudice and not as silently inventing a novel rule of prejudice per se.

[22] See also Threadgill, 172 F.3d at 369 ("[I]t is the evidence of actual knowledge that proves fatal to the defendants' claim. We have consistently held that an 'error in giving the deliberate ignorance instruction is . . . harmless where there is substantial evidence of actual knowledge.'" (quoting United States v. Cartwright, 6 F.3d 294, 301 (5th Cir. 1993))); see also, e.g., United States v. Ricardo, 472 F.3d 277, 286 (5th Cir. 2006) (holding that "[r]esolving this issue [of whether there was sufficient evidence of deliberate ignorance] is unnecessary . . . because the giving of a deliberate ignorance instruction is harmless error where substantial evidence of actual knowledge was presented"), cert. denied, 127 S. Ct. 2076, and cert. denied, 127 S. Ct. 2080 (2007); Mendoza-Medina, 346 F.3d at 135 (holding that where the defendant confessed and other evidence corroborated the confession, "substantial evidence of [defendant's] actual knowledge [rendered] the deliberate ignorance instruction harmless error"); United States v. Breque, 964 F.2d 381, 388 (5th Cir. 1992) (finding a deliberate ignorance instruction to be harmless error because "the jury was presented with considerable evidence that [defendant], in fact, knew of the reporting requirements").

[23] For example, the court instructed the jury that it had to find four elements to convict Skilling of securities fraud. One element related to the acts done in furtherance of the fraud, and it required a finding that Skilling did those acts "knowingly." Another element related to the specific-intent mental state for the securities fraud offense as a whole, and it required a

The traditional concern over the deliberate ignorance instruction is that the jury will misconceive the former mental state, which governs the act element—that is, the jury will erroneously assume that a defendant "knowingly" acquiesced in an act because he "should have known" about it. Skilling's concern, however, is different: he suggests that the deliberate ignorance instruction caused the jury to misconceive the latter mental state, which governs the specific-intent element. He asserts that the jury could have erroneously assumed that he had the specific intent to defraud because he "should have known" of the acts about which he had, in fact, admitted knowing.

Although plausible in the abstract, the likelihood of confusion in this atypical instance is not substantial, and it becomes even less so when we consider the deliberate ignorance instruction in context with the other jury instructions. Viewed as a whole, the jury instructions made it clear that the deliberate ignorance instruction related only to the act element and not to the specific-intent element.

The district court provided the deliberate ignorance instruction as part of the definition of "knowingly," a word that applied only to the act element of the fraud offense.[24] In contrast, the definition of "willfully" governed solely the specific-intent element. The latter definition was emphatic that neither mere negligence nor bad business judgment suffices to establish the specific intent to

---

finding "that the defendant acted willfully and with the intent to defraud."

[24] The instructions stated, in relevant part,

> The word "knowingly," as that term is used throughout these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. . . .

Another instruction applied "knowingly" to the act element.

defraud, and that instruction contained no deliberate ignorance definition. The "willfully" definition required the jury to find that the defendant acted "with bad purpose either to disobey or disregard the law."[25] Accordingly, there is no significant likelihood of confusion, and any error in issuing the deliberate ignorance instruction was harmless.

## B. Materiality

Skilling next asserts that the district court erred in failing to provide the jury with adequate guidance on the legal meaning of "materiality" with regard to the charges against him. After explaining to the jury that false statements or omissions can support a fraud conviction only if they are material, the court instructed the jury on the definition of materiality.[26] Skilling argues that the instruction was insufficient to convey to a "lay juror who has never invested in

---

[25] The instructions stated, in relevant part,

> The term "willfully," as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

Another instruction applied "willfully" to the specific-intent element.

[26] The jury received the following instruction:

> If you should decide that a particular statement or a particular omission was misleading at the time that it was made, then you must determine if the fact stated or omitted was a "material" fact or a "material" omission under the evidence received in this case. . . .

> In order for you to find a fact or an omission "material," the government must prove beyond a reasonable doubt the fact misstated or the fact omitted was of such importance that it could reasonably be expected to cause or to induce a person to invest or to cause or to induce a person not to invest in Enron stock. Assessment of "materiality" requires you to view the fact misstated or the fact omitted in the context of all the circumstances, including the total mix of information made available.

> The securities fraud statute under which Counts 2, 14, 16-20 and 22-29 of the indictment are brought is concerned only with such "material" misstatements or such "material" omissions and this statute does not cover minor, or meaningless, or unimportant misstatements or omissions.

31

stock in his or her life" what a reasonable investor would consider important. In particular, Skilling contends that the court erred by (1) refusing to instruct the jury about statements that constitute "puffery" and are immaterial as a matter of law, and (2) denying his proposed supplemental instruction as unnecessary in light of the instruction the court ultimately gave.[27]  He argues that both instructions were necessary because "reasonable investors disregard all sorts of information that a lay juror might mistakenly consider material, especially when viewed in hindsight," and that the district court's refusal to give each constitutes reversible error.  We address each contention in turn.

1.    Puffery

Skilling first challenges the district court's materiality instruction on the ground that the court should have specifically instructed the jury on puffery. He

---

[27] The proposed instruction read,

Statements Inherently Not Material S Certain statements are inherently not material.  For example:

Forward-Looking Statements: General predictions about a company, not worded as guarantees, and generalized positive statements about a company's prospects are not material.  Similarly, predictions about general economic conditions cannot be considered material.

Context Makes Statements Immaterial:  Even if a forward-looking statement is shown to be false, it still cannot form the basis of a claim of securities fraud if other true statements, or other cautionary statements concerning the subject matter of the statements at issue, sufficiently nullify any potentially misleading effect.

Facts Already Known to the Market:  If the truth about certain facts is known to the market, a false statement about the same facts is not material, and therefore cannot form the basis of a claim of securities fraud.

Non-Specific Puffery:  Even if a statement is demonstrably false or misleading, it is not material, and therefore cannot support a claim of securities fraud, if it is "puffery" S so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find the statement important to the total mix of information he or she would consider when making an investment decision.  For example, a corporation's commonly-heard self-praise, corporate cheerleading, and mere expressions of optimism are not considered seriously by the marketplace and investors in assessing a potential investment, and thus, such statements are not material.

sought to have the court tell the jury that even if a statement is false or misleading, it is mere "puffery" and therefore immaterial if it is "so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find the statement important to the total mix of information he or she would consider when making an investment decision." Such statements, he notes, include "generalized, positive statements about [a] company's competitive strengths . . . and future prospects." Rosenzweig v. Azurix Corp., 332 F.3d 854, 869 (5th Cir. 2003).

Although Skilling is correct that "an expression of opinion not made as a representation of fact," can constitute puffery, Mfg. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982) (citing Gulf Oil Corp. v. FTC, 150 F.2d 106, 109 (5th Cir. 1945)), not all such statements of opinion are properly classified as puffery. Similarly, although Skilling correctly points out that "generalized, positive statements about [a] company's competitive strengths . . . and future prospects" can in some cases constitute immaterial puffery, such statements of opinion by corporate insiders are not per se immaterial. In Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090, 1098 (1991), the Supreme Court considered statements that a merger proposal would give shareholders "a high value for their shares," and held that such statements could be deemed material. The Court explained,

> [i]t is no answer to argue, as petitioners do, that the quoted statement on which liability was predicated did not express a reason in dollars and cents, but focused instead on the "indefinite and unverifiable" term, "high" value, much like the similar claim that the merger's terms were "fair" to shareholders. The objection ignores the fact that such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading. Provable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements, and defended or attacked

> through the orthodox evidentiary process that either substantiates their underlying justifications or tends to disprove their existence. . . . In this case, whether $42 was "high," and the proposal "fair" to the minority shareholders, depended on whether provable facts about the Bank's assets, and about actual and potential levels of operation, substantiated a value that was above, below, or more or less at the $42 figure, when assessed in accordance with recognized methods of valuation.

Id. at 1093-94 (footnote omitted). Virginia Bankshares thus instructs that conclusory statements of reasons, belief, or opinion—e.g., "high value" and "fair"—may be so contrary to the verifiable historical facts that they falsely "misstate the speaker's [true] reasons" and "mislead about the stated subject matter." Id. at 1095.[28] Indeed, the Supreme Court expressly explained that "there is no room to deny that a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it," can be material. Id. at 1090-91.[29]

Skilling's statements about the financial health of Enron were similar to those deemed potentially material in Virginia Bankshares. For example, at the 2001 analyst conference (count 23), Skilling claimed that all of Enron's businesses, including EES and EBS, were "uniquely strong franchises with sustainable high earnings power." He also characterized Wholesale as a "stable, high-growth business" and "not a trading business." Similarly, on the March 23,

---

[28] See also, e.g., Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 364-65 (1st Cir. 1994) (deeming material defendant's statements that loan review capabilities were "strong" and allowance for loan losses were "sufficient"); In re Wells Fargo Sec. Litig., 12 F.3d 922, 930 (9th Cir. 1993) (deeming material defendant's statements that loan loss reserves were "adequate" or "substantially secured"); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 1992) (deeming material defendant's statements that loan loss reserves were "adequate" or "solid").

[29] The Court explained that "[s]hareholders know that directors usually have knowledge and expertness far exceeding the normal investor's resources, and the directors' perceived superiority is magnified even further by the common knowledge that state law customarily obliges them to exercise their judgment in the shareholders' interest." Va. Bankshares, 501 U.S. at 1091.

2001 analyst call (count 24), he claimed EBS was having "a great quarter on the intermediation side of the bandwidth business." Summarizing EBS, he said that there was "essentially strong growth on the intermediation side, strong growth on the content services side, in terms of people, budgets, the whole thing."

The jury was entitled to find those and similar statements material. The government presented evidence of contrary, verifiable historical facts regarding the actual condition of EES, EBS, and Wholesale at the time Skilling made these statements: EES was facing a potentially enormous loss; EBS had an unsupportable cost structure, was losing money, was reducing the number of its employees, and had few customers or profitable deals; and Wholesale was heavily dependent on unstable, speculative trading.

Moreover, in addressing the question of "whether statements of reasons, opinions, or beliefs are statements 'with respect to . . . fact[s]' so as to fall within the strictures of [the securities laws]," id. at 1091, the Supreme Court has concluded that such statements by directors "are factual in two senses: [(1)] as statements that the directors do act for the reasons given or hold the belief stated and [(2)] as statements about the subject matter of the reason or belief expressed," id. at 1092.[30] These statements thus cannot, as a matter of law, be deemed immaterial puffery, and the district court was correct to leave the determination of their materiality to the jury.

Skilling unsurprisingly challenges the government on the meaning of his statements and on the actual condition of the businesses to which the statements referred. But those are fact questions for the jury to resolve. A

---

[30] See also Va. Bankshares, 501 U.S. at 1093 ("[C]onclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."); In re Wells Fargo Sec. Litig., 12 F.3d at 927 ("'[A] complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.'" (quoting Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992))).

reasonable jury could find that Skilling's statements were strongly contrary to verifiable historical facts about the conditions of the businesses, that he misstated his true opinion, and that his statements were misleading to a reasonable investor who would have considered them important. Accordingly, the statements were not immaterial as a matter of law, and the evidence is sufficient to support the verdict.

2.    Proposed Supplemental Instruction

Skilling next asserts that the district court committed reversible error by denying his proposed supplemental instruction as unnecessary. Although Skilling's proposed instruction was more specific than the one the court gave, particularly with regard to puffery, the instruction the court provided captured most of the substance of Skilling's proposed supplement and adequately explained "materiality" to the jury.

Skilling's proposed supplemental instruction would have identified four specific types of statements that he contends are inherently immaterial: (1) forward-looking statements, (2) statements that context makes immaterial, (3) statements regarding facts already known to the market, and (4) statements amounting to non-specific puffery. Notwithstanding Skilling's arguments to the contrary, the district court's jury instructions properly addressed each of these types of statements. In its instructions, the court first emphasized that a statement could be deemed material only if it was "of such importance that it could reasonably be expected to cause or to induce a person to invest or to cause or to induce a person not to invest in Enron stock" and explained that "[a]ssessment of 'materiality' requires [the jury] to view the fact misstated or the fact omitted in the context of all the circumstances, including the total mix of information made available."

In light of this charge, Skilling's supplemental instruction was unnecessary to adequately explain "materiality" to the jury. The court expressly

instructed the jury to take context into account in assessing materiality. Whether a fact is already known to the market such that a statement contrary to it would not change a person's investment strategy with respect to Enron stock is part of that "context of all the circumstances" that the court instructed the jury to consider.[31] Further, the court was correct not to categorically exclude "forward-looking statements" from the jury's review. If Skilling honestly believed these predictions, then they would not be actionable.[32] However, if Skilling did not honestly believe them, then they could fall within the class of statements the Court identified in Virginia Bankshares as potentially actionable in the sense that they implicitly conveyed information about "the subject matter of the reason or belief expressed." See Va. Bankshares, 501 U.S. at 1092. Thus, the jury could conclude that such statements were actionable statements of material fact. Finally, as we have stated, the jury did not improperly consider statements that amounted to immaterial puffery as a matter of law.

Accordingly, because of the essential similarity of the proposed and given instructions, and because the latter accurately explained materiality, we conclude that the district court's refusal to give Skilling's supplemental instruction did not "seriously impair [his] ability to present a defense," Pettigrew, 77 F.3d at 1510, and that the court therefore did not abuse its discretion.[33]

---

[31] Notably, in his brief, Skilling fails to point to any statements purportedly rendered immaterial as facts already known to the market.

[32] The court addressed "forward-looking statements" in its instruction on falsity. The court instructed the jury that "a statement predicting future events concerning Enron or its stock"—i.e. a forward-looking statement—can be considered untrue only if the government "proves beyond a reasonable doubt that the defendant did not believe the statement when he made it, or the defendant knowingly concealed adverse, material information when he made the statement." Moreover, the instruction explained that "[a] prediction is not untrue however, simply because it turns out to be wrong."

[33] Although not a challenge to the jury instructions, Skilling also questions the materiality of the statements underlying his convictions on securities fraud counts 23 and 24, regarding statements that he made at the January 25, 2001 analyst conference and on the

## C.   Secret Side Deals

Skilling claims that the district court erred in refusing to accept his proposed jury instruction regarding secret side deals.   He has waived this objection to the jury instructions, however, because he proposed the side-deal instruction after the mandatory deadline for filing instructions.

Federal Rule of Criminal Procedure 30 states that "[a]ny party may request . . . that the court instruct the jury on the law," but such a request "must be made at the close of the evidence or at any earlier time that the court reasonably sets."  FED. R. CRIM. P. 30(a).   Rule 30 is a "mandatory rule," and a "condition precedent to the application of Rule 30 is that the requested instructions be presented to the Judge in timely fashion."   United States v. Mendoza, 473 F.2d 697, 700 (5th Cir. 1973).   "[F]ailure to object to jury instructions waives the objection."  United States v. Swanson, 572 F.2d 523, 528 (5th Cir. 1978).

Here, the court ordered both parties to file proposed instructions by March 31, 2006.   Skilling did not include the side-deal instruction with the other instructions he filed on March 31.   Instead, he filed it on May 10.   At a jury instruction conference later that day, the court noted that it had received the side-deal instruction "a few hours ago," and rejected it.[34]  Because Skilling failed

---

March 23, 2001 analyst call.  He argues that the jury improperly convicted him for statements that were "immaterial as a matter of law."  For the reasons stated in this subsection regarding the appropriateness of the jury instructions on materiality, however, we find Skilling's challenge to lack merit and reject his assignment of error.

[34] Skilling reasons that he did not waive his objection because he submitted the side-deal instruction before two jury instruction conferences that constituted an "ongoing dialogue concerning jury instructions."  Although correct at a high level of generality, this argument misses the point.  The ongoing dialogue to which Skilling refers involved the parties' responses and modifications to the original instructions required to be filed by March 31.  Because he filed no instruction relating to side deals by that date, Skilling's untimely side-deal instruction was not properly part of the ongoing dialogue.

to submit the side-deal instruction to the district court by the deadline, he has waived his objection to the court's refusal to give that instruction.

D.    Good-Faith Reliance

In his final jury instruction challenge, Skilling claims that the district court inadequately instructed the jury regarding good-faith reliance[35] and improperly refused to accept his proposed supplemental instruction on this topic.[36]    Skilling argues that the court's instruction confused the jury in

---

[35] The district court's four-paragraph good-faith reliance instruction stated,

Good faith is a complete defense to the charges of conspiracy, securities fraud, and wire fraud contained in the indictment since good faith on the part of a defendant is inconsistent with intent to defraud or willfulness which is an essential part of the charges.  The burden of proof is not on the defendants to prove their good faith since they have no burden to prove anything.  The government must establish beyond a reasonable doubt that the defendants acted with specific intent to defraud as charged in the indictment.

One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though his opinion or his belief is mistaken; and, similarly, evidence that establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.

On the other hand, an honest belief on the part of a defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute "good faith" as used in these instructions if, in carrying out the venture, a defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.

Reliance on the advice of an accountant or attorney may constitute good faith.  To decide whether such reliance was in good faith, you may consider whether the defendant relied on a competent accountant or attorney concerning the material fact allegedly omitted or misrepresented, whether the accountant or attorney had all the relevant facts known to the defendant at the time, whether the defendant received an opinion from the accountant or attorney, whether the defendant believed that the advice was given in good faith, and whether the defendant reasonably followed the advice.

[36] The proposed instruction stated,

Reliance on the advice of attorneys—whether employed by Enron or working for outside law firms and hired by Enron—may constitute good faith. To decide whether such reliance was in good faith, you may consider whether Mr. Skilling, Mr. Lay, or Enron sought the advice of a competent attorney concerning the conduct at issue in this case, whether Mr. Skilling or Mr. Lay

suggesting that a defendant may rely in good faith on the advice of counsel, because a jury could conceivably reason by negative implication that a defendant may not rely on subordinates who in turn rely on counsel. He contends that his supplemental instruction was necessary to make it plain that he could rely on subordinates to vet transactions instead of having to seek legal advice himself.

Such confusion was highly unlikely. The district court's comprehensive good-faith reliance charge correctly and thoroughly explained the law and adequately instructed the jury. In its instruction, the four paragraphs of which are properly read in the conjunctive, the court first explained to the jury the general "complete defense" of good faith, stating, inter alia, that "[o]ne who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though his opinion is erroneous or his belief is mistaken . . . ." The court then instructed the jury that "[r]eliance on the advice of an accountant or attorney may constitute good faith." The language of the latter instruction did not say or imply that only such reliance constitutes good faith. Rather, it offered a specific example of one type of reliance that falls within the ambit of good-faith reliance.

If, as Skilling argues, he relied in good faith upon subordinates who in turn relied upon counsel, Skilling would have honestly held the opinion he had expressed, even though he was mistaken. This clearly falls within the definition of good faith from the district court's jury instruction. The likelihood of jury

---

reasonably believed that the attorney had received all the relevant facts available at the time, whether Mr. Skilling or Mr. Lay received an opinion from the attorney or were told or could reasonably assume legal counsel had approved the transaction, whether Mr. Skilling or Mr. Lay believed the opinion was given in good faith, and whether Mr. Skilling or Mr. Lay reasonably followed the opinion given.

A defendant is not required personally to provide information to a company's attorney. It is sufficient that a defendant reasonably believed that a reliable and competent officer or employee of the company provided to the attorney the relevant facts known about a given topic at that time.

confusion was therefore minimal, and the instruction certainly did not "seriously impair [Skilling's] ability to present a defense." See Pettigrew, 77 F.3d at 1510. Thus, we reject Skilling's challenge.

## V. Jury Prejudice

In his opening brief, Skilling makes two venue arguments.[37] First, he contends that the community's acrimony was so vitriolic that we should presume that it was impossible for him to receive a fair trial in Houston. Second, he asserts that actual prejudice contaminated the jury box.

We review de novo whether presumed prejudice tainted a trial, and this review includes conducting "an independent evaluation of the facts." United States v. Williams, 523 F.2d 1203, 1208 (5th Cir. 1975); see also United States v. McVeigh, 153 F.3d 1166, 1179 (10th Cir. 1998). In reviewing actual prejudice, however, we afford greater deference to the district court, because "[t]he determination of whether the seated jury could remain impartial in the face of negative pretrial publicity, and the measures that may be taken to ensure such impartiality, lay squarely within the domain of the trial court." McVeigh, 153 F.3d at 1179. Consequently, we "review[] the district court's ruling on jury impartiality for manifest abuse of discretion." United States v. Wharton, 320 F.3d 526, 535 (5th Cir. 2003) (internal quotation marks omitted).

It would not have been imprudent for the court to have granted Skilling's transfer motion. The issue before us, however, is whether the court committed reversible error. It did not. Skilling has waived most of his argument by failing to challenge jurors for cause during voir dire. In fact, of the twelve jurors who sat on the jury, Skilling had objected for cause to only one, and he did not

---

[37] In his reply brief, Skilling adds an argument that publicity during the trial also affected the jury. Skilling appears not to have raised that contention as a distinct legal claim in his initial brief, and it is arguably waived. See, e.g., Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994). We need not reach that question, however, because even after considering the additional material, our opinion is no different.

challenge any of the alternate jurors for cause. Therefore, despite our agreement with Skilling that we can presume prejudice in this case, the government rebutted any presumed prejudice, and Skilling has not satisfied his burden as to actual prejudice.

A.    Presumed Prejudice

"A defendant is entitled to a fair trial by an impartial jury which will render its verdict based upon the evidence and arguments presented in court without being influenced by outside, irrelevant sources."   United States v. Chagra, 669 F.2d 241, 249 (5th Cir. 1982), abrogated in part on other grounds by Garrett v. United States, 471 U.S. 773 (1985).  To satisfy this constitutional guarantee,  veniremembers are not required to be wholly ignorant of a case's facts; instead, "'[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court.'"  Id. (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).

If "an appellant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury," then "[p]roof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case."  Id. at 250.  Importantly, "[t]his presumption is rebuttable . . . and the government may demonstrate from the voir dire that an impartial jury was actually impanelled in appellant's case.  If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity."  Id. (citations omitted).[38]

---

[38] Even if a defendant cannot meet the higher burden for finding presumed prejudice, it is possible for the defendant to "raise[] a significant possibility of prejudice" such that the district court's voir dire is subject to additional scrutiny.  Chagra, 669 F.2d at 250 (internal quotation marks omitted).  But, "'[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate

Presumed prejudice "is only rarely applicable," being "confined to those instances where the petitioner can demonstrate an extreme situation of inflammatory pretrial publicity that literally saturated the community in which his trial was held." Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980) (internal quotation marks and citation omitted). The prejudice also must be "apart from mere familiarity with the case." Id. at 999.[39]

Before conducting voir dire, the district court denied Skilling's motion to transfer venue,[40] finding that there was inadequate evidence of community hostility. The court noted that "[u]nlike many of the cases cited by [Skilling], the facts in this case are neither heinous nor sensational" and that "for the most part, the reporting appears to have been objective and unemotional," with a "largely fact-based tone." We disagree with that finding and conclude that Skilling was entitled to a presumption of prejudice.

There was sufficient inflammatory pretrial material to require a finding of presumed prejudice, especially in light of the immense volume of coverage.[41] "Inflammatory" is defined as "tending to cause strong feelings of anger, indignation, or other type of upset; [or] tending to stir the passions." BLACK'S LAW DICTIONARY 794 (8th ed. 2004). Our independent review of the record

---

perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire.'" Id. (quoting Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (plurality opinion)).

[39] The government questions whether Skilling has waived his Federal Rule of Criminal Procedure 21(a) venue argument by failing to raise it in his opening brief. If he has, then we review his venue arguments only against the minimum constitutional baseline, which he did raise, and not the standard of Rule 21, which would be more favorable to him. See Williams, 523 F.2d at 1209 n.11. Although we are sympathetic to the government's argument, we need not reach this issue, because we come to the same result under either standard.

[40] A district court should usually hold a transfer motion in abeyance while conducting voir dire instead of dismissing it at the outset. See Williams, 523 F.2d at 1209 n.10.

[41] Skilling cites thousands of relevant local television features and hundreds of newspaper articlesSSmany of them on the front pageSSabout himself and Enron.

convinces us that the community bias in the Houston area met this standard.[42] Local newspapers ran many personal interest stories in which sympathetic individuals expressed feelings of anger and betrayal toward Enron. These stories are hard to characterize as non-inflammatory, even if the stories were simply reporting the facts. Skilling shows that the Houston Chronicle ("Chronicle") alone ran nearly one hundred such stories.

Even the Chronicle's sports page wrote of Skilling's guilt as a foregone conclusion.[43] Similarly, the Chronicle's "Pethouse Pet of the Week" section mentioned that a pet had "enjoyed watching those Enron jerks being led away in handcuffs." These are but a few examples of the Chronicle's coverage. Moreover, prejudice was inherent in an alleged co-conspirator's well-publicized decision to plead guilty on the eve of trial.[44] In these circumstances, even under typical pretrial publicity precedent, Skilling demonstrated sufficient inflammatory and pervasive coverage to raise a presumption of prejudice.[45]

More importantly, the district court apparently did not consider the wider context. Given that "every claim of potential jury bias due to publicity turns on

---

[42] For instance, there was this statement in a Houston Chronicle news story: "'I'm livid, absolutely livid . . . . I have lost my entire friggin' retirement to these people. They have raped all of us.'" In the next line, the paper reported that "[f]ormer Chairman Ken Lay received about $67 million in 2001, while former CEO Jeff Skilling got about $40 million, according to a bankruptcy court filing Enron released on Monday."

[43] There was, however, a sports-related reason for the sports page to mention Enron, as the Houston Astros renamed their stadium—previously called Enron Field—to Minute Maid Park.

[44] See United States v. Hawkins, 658 F.2d 279, 284-85 (5th Cir. Unit A Sept. 1981) (acknowledging the potential prejudicial effect of guilty pleas on remaining defendants).

[45] In its ruling, the district court quoted from a Chronicle story that branded Skilling as the "Ultimate Enron defendant" and detailed how, "[r]ather than lying low, . . . Skilling keeps making news" such as being "arrested after a drunken scuffle in New York." The story also said, after quoting Skilling as protesting that he had "nothing to hide," that "[w]e"—presumably the Chronicle staff, although possibly an allusion to the people of Houston—"can't wait for the trial." We do not agree with the district court's characterization of this story as having a "fact-based tone."

its own facts," United States v. Beckner, 69 F.3d 1290, 1293 n.3 (5th Cir. 1995), it was not enough for the court merely to assess the tone of the news reporting.[46] The evaluation of the volume and nature of reporting is merely a proxy for the real inquiry: whether there could be a "fair trial by an impartial jury" that was not "influenced by outside, irrelevant sources." Chagra, 669 F.2d at 249.

The district court seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims. Thousands of Enron employees in Houston lost their jobs, and many saw their 401(k) accounts wiped out. As happens, moreover, in an interconnected economy, Enron's demise spilled over into other industries. Accounting firms that serviced Enron's books had less work, hotels had more open rooms, restaurants sold fewer meals, and so on. The collapse of Enron affected countless people in the Houston area, and the district court failed to account for any of this non-media prejudice.[47]

Precedent also cuts in favor of Skilling. Unsurprisingly (given the strictness of the test for presumed prejudice), there are more cases in which the test has not been satisfied than in which it has, but when we look at the reasons why the test was not satisfied, this case is distinguishable. For instance, in Hale v. United States, 435 F.2d 737, 748 (5th Cir. 1970), we focused, inter alia, on the lack of "editorials or cartoons denounc[ing]" the defendant. Here, by contrast, there were several editorial cartoons condemning Skilling, one even going so far as to blame him for a supposed recession.

---

[46] There is a need to determine whether the reporting was "straightforward [and] unemotional" or a "long harangue condemning [the defendant]." Chagra, 669 F.2d at 251.

[47] Skilling offered opinion polls suggesting that one in three Houston citizens "personally kn[e]w" someone harmed by what happened at Enron. The district court rejected these polls, noting that "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias." But that is the point: we evaluate the quality of the voir dire because Skilling established a presumption of prejudice.

Likewise, in Calley v. Callaway, 519 F.2d 184, 206 (5th Cir. 1975) (en banc), we noted that there was evidence of "considerable sympathy" for the defendant, a soldier accused of participating in the My Lai Massacre during the Vietnam War. There was little to no evidence of "considerable sympathy" for Skilling. We also noted in Calley that there was a "long period of time between the peak of the publicity and the beginning of the trial." Id. at 208. Here, the publicity remained intense throughout. In United States v. Capo, 595 F.2d 1086, 1091 (5th Cir. 1979), we put weight on the fact that the trial was held "some distance" from where the crime occurred, about one hundred miles. By contrast, Skilling's trial happened about six blocks from Enron's former headquarters.

In sum, given the unique circumstances of this case, the pervasive community bias against those who oversaw Enron's collapse, and the inflammatory pretrial publicity in the Houston area, Skilling was entitled to a presumption of prejudice.

B.    Whether the District Court Empaneled an Impartial Jury

Although there is sufficient evidence here to raise a presumption of prejudice, the "presumption is rebuttable, . . . and the government may demonstrate from the voir dire that an impartial jury was actually impanelled in appellant's case. If the government succeeds in doing so, the conviction will stand . . . ." Chagra, 669 F.2d at 250 (citation omitted). An effective voir dire generally is a strong disinfectant of community prejudice,[48] but it is especially important in cases such as this one with a great deal of prejudice.[49]

---

[48] See Calley, 519 F.2d at 209 n.45 ("There has been a greater willingness to uphold a trial court's determination that jurors were capable of rendering an impartial verdict where that conclusion was reached after deliberate, searching, and thorough voir dire.").

[49] A district court has "broad discretion" in conducting voir dire, and

[t]he court's discretion extends both to the decision whether to propound questions proffered by counsel and whether jurors should be questioned collectively or individually out of the presence of other jurors. This broad

46

Non-exhaustive factors we consider in determining the adequacy of voir dire include (1) the percentage of the entire pool of veniremembers who evidenced bias, Irvin, 366 U.S. at 727 (noting that almost 90% of the venire was biased); (2) whether the court questioned the veniremembers individually, see, e.g., Capo, 595 F.2d at 1091; (3) whether the court questioned the veniremembers thoroughly concerning their knowledge of the circumstances surrounding the alleged crime, id.; (4) whether the court asked each veniremember specifically about the nature and extent of any preconceived notions, id.; (5) whether the court asked each veniremember about his or her capability to render an impartial verdict, id.; (6) the length of time the process took, id. at 1092 (noting that the voir dire took "an arduous 10 day[s]"); (7) whether the court examined the veniremembers outside the presence of other veniremembers (although that is not per se necessary), United States v. Davis, 583 F.2d 190, 197-98 (5th Cir. 1978); (8) whether the attorneys had "the opportunity to recommend further inquiries," Chagra, 669 F.2d at 254;[50] and (9) whether the "judge[] himself inquired into the prospective [jurors'] exposure to publicity and ability to render a fair and impartial verdict," Calley, 519 F.2d at 209.

Finally, if "the nature of the publicity as a whole raises a significant

---

discretion, however, is limited by the requirements of due process, and the reviewing court must independently evaluate the voir dire testimony of empanelled jurors, as well as the record as a whole, and determine whether the method of voir dire adopted by the district court is capable of giving reasonable assurance that prejudice would be discovered if present. The district court's decision will not be lightly overturned.

Hawkins, 658 F.2d at 283 (internal quotation marks and citations omitted); see also Mu'Min v. Virginia, 500 U.S. 415, 427 (1991).

[50] See also Calley, 519 F.2d at 209 ("[M]ore importantly, both defense counsel and the prosecution were allowed almost unlimited freedom to inquire into the court members' attitudes, perceptions, backgrounds and the nature and extent of their exposure to pretrial publicity.").

possibility of prejudice, and a juror acknowledges some exposure to that publicity, more than the abbreviated questioning . . . is necessary," because a "juror is poorly placed to make a determination as to his own impartiality. Instead, the trial court should make this determination." United States v. Hawkins, 658 F.2d 279, 285 (5th Cir. Unit A Sept. 1981) (internal quotation marks omitted).

The district court here conducted an exemplary voir dire. After prescreening veniremembers based upon their responses to a fourteen-page questionnaire, the parties mutually agreed to excuse 119 of them.[51] The court summoned the remaining veniremembers and explained the importance of an impartial jury. The court then asked whether "any of you have doubts about your ability to conscientiously and fairly follow these very important rules." Two veniremembers indicated they could not be fair, and the court called them to the bench and individually examined them, then excused them for cause.

Before questioning individual veniremembers, the court again emphasized that the case was not about the collapse of Enron and that serving as a juror was not about looking "to right a wrong or to provide remedies for those who suffered from the collapse of Enron." The court admonished the jurors that they could not "seek vengeance against Enron's former officers because of some wrongdoing they believe Enron or its officers may have committed," and that anyone who has such an attitude cannot "be a fair and impartial juror." The court asked veniremembers whether they knew anyone involved in the case, going through a lengthy list. If a prospective juror had any connection, the court stopped and made inquiries as to the nature of the relationship. The court also warned the prospective jurors that they should not necessarily trust what they read in the newspapers.

---

[51] Contrary to Skilling's argument, it is inaccurate to say that voir dire took only one day. We consider the extensive questionnaire in assessing the quality of voir dire as a whole.

After dividing the venire into subgroups, the court asked each veniremember individually about various answers in his or her questionnaire. It asked each whether he or she remembered articles or television broadcasts pertaining to the trial. The attorneys then had the opportunity to request follow-up questions, and nearly every time the court permitted the attorneys to ask questions directly.[52] The court made credibility determinations; it was thorough, requiring more than just the veniremembers' statements that he or she could be fair.

Because the court conducted a proper and thorough voir dire, the question is whether, notwithstanding this searching voir dire, the government failed to meet its burden to show that the court did not actually empanel a juror who was unconstitutionally prejudiced. See Chagra, 669 F.2d at 250. After examining the record, we conclude that the government has met its burden. Although Skilling goes to great lengths to argue prejudice, during voir dire he failed to challenge for cause all but one of the jurors who actually sat. Of the alternate jurors, Skilling challenged none, so he cannot complain on appeal.[53]

---

[52] Twice the district court limited the ability of Lay's attorney to question jurors directly. Although that is technically "more than once," as Skilling characterized it, Skilling's contention is misleading. Counsel for the defendants directly asked questions of twenty-seven veniremembers.

[53] See Dawson v. Wal-Mart Stores, 978 F.2d 205, 208-09 (5th Cir. 1992) ("Dawson asserts that three members of the jury panel had a close relationship with defense counsel and were therefore unable to render an impartial verdict. However, Dawson's counsel did not challenge any of the three persons for cause, nor did he use any of his peremptory challenges to strike them. The trial transcript reveals that Dawson was given a fair opportunity to question each juror on voir dire and to remove them from the venire, but that he chose to exercise his challenges on others. When the basis for challenge to a juror is timely shown, the failure to object constitutes a waiver of the right to attack the composition of the jury."); see also Marks v. Shell Oil Co., 895 F.2d 1128, 1129-30 (6th Cir. 1990) ("Marks waived this ground for challenging Kenney's fitness for jury service by failing to raise it at voir dire. . . . Although Marks did challenge Kenney as a juror for cause, Marks's challenge was based on Kenney's past employment in the oil business, alleging that this past employment would bias Kenney. Marks never suggested that Kenney could not be an impartial juror because of any concerns he had over the effect that his time in jury service would have on his business. This failure

The only juror who sat that Skilling had challenged for cause was Juror 11, who worked with a former Enron employee who had lost 401(k) money. Juror 11, however, never spoke with that person about Enron's management, and he said he "would have no problem" telling his co-worker that the government did not prove its case, resulting in acquittal, if that were to happen at trial.

True, Juror 11 also felt that Lay was "greedy" and that CEOs "from Billy Sol Estes to T. Boone Pickens" were greedy, looking "to meet the bottom line," that CEOs in general "walk a line that stretches sometimes the legality of something," and that "I'm not going to say that they're all crooks, but, you

---

cannot stem from any lack of notice to Marks of Kenney's concerns because they were discussed in full during the voir dire. Marks cannot argue on appeal facts that she was able, but chose not, to raise below."); United States v. Petary, 857 F.2d 458, 462 (8th Cir. 1988) ("Six next argues that the district court erred in denying his motion for change of venue because of prejudicial pre-trial publicity. Six waived any objection by failing to question any juror about his or her knowledge of this case during voir dire."); Robinson v. Monsanto Co., 758 F.2d 331, 335 (8th Cir. 1985) ("[T]he right to challenge a juror is waived by failure to object at the time the jury is empaneled if the basis for objection might have been discovered during voir dire."); cf. United States v. Musquiz, 45 F.3d 927, 931 (5th Cir. 1995) ("By withdrawing the challenge [to a member of the venire], Gatewood waived his objection.").

Because we presume prejudice in this case, it is the government's burden to show that the district court empaneled an impartial jury. It thus could be argued that traditional waiver rules do not apply; we disagree, because the district court expressly asked Skilling whether he sought to challenge each individual veniremember, and he said he did not. The government implicitly argued that it had met its burden, and Skilling, by explicitly saying there was no challenge, agreed. If he had objected, the government would have had the opportunity to respond, and an objection would have allowed the court to correct any possible errors before expending substantial judicial resources. Cf. United States v. Calverley, 37 F.3d 160, 162 (5th Cir. 1994) (en banc) ("One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result in its forfeiture.").

By agreeing with the court and government that he did not have any challenges for cause, Skilling "intentional[ly] relinquish[ed] or abandon[ed] a known right," United States v. Olano, 507 U.S. 725, 733 (1993) (internal quotation marks omitted), so his argument is waived. Were it otherwise, a defendant in a presumed-prejudice case could keep an ace up his or her appellate sleeve by acquiescing to jurors at trial and then arguing error on appeal.

know . . . ."[54] But he had "no idea" whether Skilling had "crossed that line," and he "didn't say that" every CEO is probably a crook. He also asserted that he could be fair and require the government to prove its case, that he did not believe everything he read in the paper, that he did not "get into the details" of the Enron coverage, that he did not watch television, and that Enron was "old news."

Juror 11 likewise expounded upon his view that "greedy" did "not necessarily" equate to "illegal," agreeing that "greed and ambition are the same thing." He even asserted that he believed the defendants "earned their salaries," but also that some "bonuses and stuff" are "obscene" in his "opinion." He stated that CEOs "normally stretch" because "it's all a new frontier," and CEOs "try[] to satisfy their shareholders . . . ." Relatedly, he explained that he did not think he could be convinced Lay was not greedy, because "anybody that takes home the salaries and the bonuses and stuff that they have, they got to be greedy, or they wouldn't do that."

The court denied the motion to disqualify for cause, explaining, "I looked him in the eye and I've heard all his questions and the motion is denied." The court observed Juror 11's demeanor, listened to his answers, and believed he would make the government prove its case. Although Juror 11 spoke of "greed" (which he equated with ambition) and "stretch[ing]" the law, he was forthright that he had no view as to Skilling's guilt. He also evinced a healthy skepticism of the news.

The express finding that Juror 11 was fair is not reversible error, meaning that the government has met its burden of demonstrating the impartiality of the

---

[54] It is uncertain from the transcript whether he stated "you know" with the inflection of "come on, they are obviously guilty" or instead with a tone suggesting that the veniremember was searching his mind to explain what he meant.

empaneled jury.[55] For the same reasons, Skilling cannot show that any juror who actually sat was prejudiced against him.[56]

In sum, although Skilling demonstrated sufficient community bias to raise a presumption of prejudice, the district court's voir dire more than mitigated any effects of this prejudice. The government met its burden of showing that the actual jury that convicted Skilling was impartial. Accordingly, we decline to reverse Skilling's convictions on this basis.

## VI. Prosecutorial Misconduct

Skilling contends that the government deprived him of the ability to present favorable evidence, thereby unconstitutionally abusing its prosecutorial

---

[55] In Mayola, 623 F.2d at 1001, we stated that the government can rebut a presumption of prejudice, but that "[o]f course, it could not be [rebutted] merely by the jurors' assurance on voir dire of their own impartiality"; we added that "[o]n the other hand, a showing that none of the twelve jurors impanelled had ever been exposed, first or second hand, to the inflammatory publicity, would probably suffice to negate the presumption of prejudice flowing from that publicity." Id. We did not suggest, however, that in all cases of presumed prejudice, the only way for the government to rebut the presumption is by showing that none of the jurors had any knowledge whatsoever of any publicity.

[56] In an attempt to avoid this result, Skilling points to a number of statements from veniremembers who were not selected as jurors. Skilling argues that the statements are relevant, because it is erroneous "to force a party to exhaust his peremptory challenges on persons who should be excused for cause." United States v. Dozier, 672 F.2d 531, 547 (5th Cir. 1982) (internal quotation marks omitted).

Dozier, however, no longer represents the law of this circuit. Although we are bound by a prior panel's decision unless the court en banc has reversed it or there has been intervening Supreme Court precedent, see, e.g., Burlington N. R.R. v. Bhd. of Maint. of Way Employees, 961 F.2d 86, 89 (5th Cir. 1992), here there is a later Supreme Court decision. As we recognized in Wharton, 320 F.3d at 535, "[a] district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial." For that proposition, we cited United States v. Martinez-Salazar, 528 U.S. 304, 313-18 (2000), which held that "a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause," id. at 317. Thus, the Wharton panel's construction of Martinez-Salazar is the law of the circuit. Because the only juror whom Skilling even objected to for cause was Juror 11, and because the court did not err in denying Skilling's objection to that person, we need not consider whether the court erred in denying some of Skilling's other objections for cause.

powers. In particular, Skilling argues that the government violated his Sixth Amendment right to present witnesses on his behalf and infringed on his Fifth Amendment right to be free from governmental interference when preparing his defense.

Skilling requested interviews from hundreds of individuals involved in some way with Enron, but few agreed even to meet with him. In April 2005, he sent letters to 144 potential witnesses requesting meetings, but only two accepted the invitation. In May 2005, he sent 138 more letters, but only two more agreed. The district court then sent letters to thirty-eight potential witnesses to inform them that the government would not retaliate against them if they cooperated with Skilling.[57] Even after the district court sent these letters,

---

[57] The district court sent a letter to counsel for a number of potential witnesses that the prosecution and defense had jointly identified, informing counsel that

> [the court has] been informed by the government that if you wish to speak with defense counsel: (i) you need not seek permission from the government or notify them about the meetings; (ii) you have the government's consent to meet with the defense to the extent such consent is required by any agreement you may have with the government; (iii) you are free to discuss whatever you choose to discuss, whether or not you have any agreement with the government limiting what information may be shared with third parties; and (iv) you are free to agree to testify on defendants' behalf at trial.

The district court concluded,

> [f]inally, if you believe it would help you decide whether to meet with defense counsel or testify on their behalf at trial, I am willing to meet with you, along with representatives of all parties, to address any concerns about speaking to the defense in this case.

In conjunction with the letters, the district court issued an order, dated May 27, 2005, to address any of the witnesses' concerns that the government would retaliate against those that cooperated with Skilling. The order provided that

1. All counsel in a criminal proceeding may seek to contact and interview witnesses before trial.
2. Whether or not a witness wishes to talk to the attorneys or representatives of either party in this case is entirely up to the witness.
3. Should a witness decide to provide information or assistance to the defense, the government will not view the witness's decision to cooperate with defense counsel as any lack of cooperation with the government, and the government will not use such cooperation as a basis for decisions

however, only one more witness came forward. Skilling asserts that prosecutorial misconduct was the catalyst for the witnesses' decisions not to assist in his defense.

The district court considered these allegations, conducted an evidentiary hearing into some of the more troubling ones, and concluded, as a factual matter, that Skilling had not proven prosecutorial misconduct. The district court found that Skilling did not demonstrate substantial interference with any witness's choice to testify and that the government did not engage in any practice that denied Skilling a fair trial. Our review of the record convinces us that the district court did not commit clear error. Moreover, the district court's letter to the potential witnesses mitigated any possible prejudice.[58]

Before addressing Skilling's allegations of prosecutorial intimidation of witnesses, however, we turn briefly to Skilling's argument that "serious legal error" tainted the court's ruling based on the court's discussion of the witnesses' Fifth Amendment rights. The district court stated during a pretrial hearing that there was a "reasonable likelihood" that the witnesses did not cooperate with Skilling because the witnesses were guilty of related crimes and wished to assert their Fifth Amendment privilege to avoid incriminating themselves.[59] Although

---

regarding prosecution.

[58] Although the district court's letter mitigated the potential prejudice Skilling may have suffered, it did not necessarily render any misconduct per se harmless. That is, the letter is relevant to whether any misconduct was harmless, but it alone is not sufficient.

If the government's conduct is egregiously threatening, would-be witnesses may not believe that it is worth taking the chance of crossing prosecutors, regardless of what a well-meaning judge says in a letter. Such a letter, however, is circumstantial evidence that tends to reinforce the court's determination that prosecutorial misconduct did not drive the decision of potential witnesses to shun the defendant. When the court sends a letter of this sort, the convicted party's burden on appeal is steeper, but it is not insurmountable.

[59] The court stated that "[t]he primary reason a person asserts a Fifth Amendment privilege is because the person is guilty of criminal conduct and wants to avoid incriminating himself by testifying," and that "[g]iven the number of people who have pleaded guilty and have been found guilty for perpetrating Enron-related crimes . . . there is a reasonable

the district court did not make this statement during the witnesses' trials or in the presence of a jury, it is still troubling. In Carter v. Kentucky, 450 U.S. 288 (1981), the Supreme Court recognized that a witness may have many reasons, unrelated to guilt or innocence, for declining to testify:

> It is not every one who can safely venture on the witness stand though entirely innocent of the charge against him. Excessive timidity, nervousness when facing others and attempting to explain transactions of a suspicious character, and offences charged against him, will often confuse and embarrass him to such a degree as to increase rather than remove prejudices against him. It is not every one, however honest, who would, therefore, willingly be placed on the witness stand.

> Other reasons include the fear of impeachment by prior convictions . . . or by other damaging information not necessarily relevant to the charge being tried, and reluctance to incriminate others whom [defendants] either love or fear.

Id. at 300 n.15 (alteration in original) (internal quotation marks and citations omitted). Skilling fails to demonstrate reversible error, however, because he did not provide any evidence that the district court's statement was "sufficiently egregious in nature and degree so as to deprive [Skilling] of a fair trial." See United States v. Weddell, 800 F.2d 1404, 1411 (5th Cir. 1986).

The Supreme Court has recognized that the Constitution entitles a criminal defendant to a fair trial, not a perfect one, and has emphatically rejected automatic reversal without regard to whether the error was harmless beyond a reasonable doubt. See United States v. Hasting, 461 U.S. 499, 508-09 (1983). The district court's statement that witnesses may have asserted their privilege against self-incrimination due to their guilt did not result in a blanket dismissal of Skilling's arguments or a denial of his right to be heard. As discussed below, the district court still examined Skilling's proffered evidence of

---

likelihood that the proposed witnesses have asserted their Fifth Amendment privilege for this reason, and not because of fear of government reprisals if they testified."

misconduct when deciding whether to grant an evidentiary hearing, held a hearing on the two most persuasive allegations of misconduct, and, out of an abundance of caution, issued letters to potential witnesses encouraging them to speak with the defense. These actions demonstrate that even if the district court erred in ruminating about the witnesses' invocations of their Fifth Amendment rights, that error was harmless. Accordingly, we find no evidence that the district court's statement deprived Skilling of a fair trial.

Having disposed of Skilling's argument regarding the district court's statement about the witnesses' Fifth Amendment rights, we now turn to Skilling's allegations of prosecutorial misconduct. In particular, Skilling contends that the district court improperly refused to consider various hearsay declarations and that plea agreements impermissibly restricted witnesses from cooperating with him. Skilling also makes general allegations of witness intimidation and points to specific instances where the government's alleged misconduct dissuaded witnesses from testifying.

"The Sixth Amendment guarantees a criminal defendant the right to present witnesses to establish his defense without fear of retaliation against the witness by the government," and "the Fifth Amendment protects the defendant from improper governmental interference with his defense." United States v. Bieganowski, 313 F.3d 264, 291 (5th Cir. 2002) (internal quotation marks and citations omitted). "[A]s a general rule, '[w]itnesses . . . to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them.'" United States v. Soape, 169 F.3d 257, 270 (5th Cir. 1999) (quoting Gregory v. United States, 369 F.2d 185, 188 (D.C. Cir. 1966)) (second alteration in original). Of course, "[n]o right of a defendant is violated when a potential witness freely chooses not to talk [to defense counsel]." In re United States, 878 F.2d 153, 157 (5th Cir. 1989).

We have explained that to demonstrate governmental infringement on these Sixth Amendment rights, "the defendant must show that the government's conduct interfered substantially with a witness's free and unhampered choice to testify." United States v. Thompson, 130 F.3d 676, 686 (5th Cir. 1997) (internal quotation marks omitted). "Whether a defendant has made a showing of substantial interference is a fact question [that we review] for clear error." Bieganowski, 313 F.3d at 291. Violations of these rights are subject to a harmless error analysis, so we will not reverse unless "the prosecutor's conduct was sufficiently egregious in nature and degree so as to deprive [the defendant] of a fair trial." See Weddell, 800 F.2d at 1411.

## A. Hearsay Declarations

Skilling presented hearsay evidence that potential witnesses did not meet with him because they feared government reprisal. The district court learned of this evidence third-hand, in affidavits from Skilling's attorneys, who received the information from the witnesses' attorneys, who purportedly conveyed the views of their clients. On appeal, Skilling argues that the court erred in failing to credit the hearsay evidence in its conclusion that there was no prosecutorial misconduct, as Federal Rule of Evidence 804(b)(6) allows hearsay where the government is responsible for making a witness unavailable.[60] Because Skilling did not present this argument to the district court, we review only for plain error.[61] Therefore, we must ask whether there was error that was plain and

---

[60] Rule 804(b)(6) reads, "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." FED. R. EVID. 804(b)(6).

[61] Skilling counters that it was obvious on the face of the declarations he presented that Rule 804(b)(6) applied, suggesting that he raised this particular argument below. The Federal Rules of Evidence, however, require a party who complains of the district court's decision to exclude evidence to show that "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." FED. R. EVID. 103(a)(2); see United States v. Martinez, 486 F.3d 855, 860-61 (5th Cir. 2007) (finding that an

affected Skilling's substantial rights. United States v. Olano, 507 U.S. 725, 732-33 (1993).

Even assuming that the district court erred, that error was not plain. Under Rule 804(b)(6), Skilling had the burden of showing that the government was responsible for the unavailability of the declarants. See United States v. Scott, 284 F.3d 758, 762 (7th Cir. 2002). To meet this burden, Skilling proffered the hearsay declarations that his attorneys had obtained. The district court found that these declarations did not meet Skilling's burden, except for two declarations of attorneys Wendell Odom ("Odom") and Robert Sussman ("Sussman"), who represented several witnesses who had expressed concerns about what would happen if they met with Skilling's lawyers. Based on these declarations, the district court ordered those two attorneys to appear before it to question them further. That is, the court implicitly considered all of these declarations in deciding to grant a hearing. In the end, however, the district court found that the declarations were insufficient for Skilling to meet his burden of showing that the government was responsible for the witnesses' unavailability. Skilling does not explain adequately why the district court was incorrect in this conclusion, especially given that the court did consider the declarations, and accordingly, he fails to demonstrate plain error. Further, this court has not resolved whether, to invoke Rule 804(b)(6) properly, a party must make this evidentiary showing with material independent of the hearsay itself.

---

issue was preserved when the defendant explained the issue to the district court even though the defendant made no reference to case law). Skilling never cited Rule 804(b)(6), never suggested that an exception to the hearsay requirement would allow the court to consider the declarations, and never formally moved to admit his attorneys' declarations. Thus, Skilling did not make "known to the [trial] court the action which he desire[d] the court to take or his objection to the action of the court and the grounds therefor." United States v. Arteaga-Limones, 529 F.2d 1183, 1198 (5th Cir. 1976) (internal quotation marks omitted) (first alteration in original). Accordingly, we must review the district court's ruling only for plain error.

This is a question of first impression, and there are persuasive arguments for either position or for a hybrid of the two.[62] This question is especially difficult here given that it was the defense counsel who made the uncorroborated hearsay declarations. Under such circumstances, any error is not plain.[63]

As noted above, the district court was particularly cautious regarding the declarations that it believed might demonstrate prosecutorial misconduct. The court held an evidentiary hearing regarding alleged threats to Sussman, a lawyer representing several former Enron employees. At the hearing, Sussman indicated that a number of factors informed his advice to his clients that they should not cooperate with Skilling. He acknowledged that the "possibility" that the government might look "unfavorably" at cooperation was one of them, but he also expressly testified that the potential for government reprisal was only one "[a]mong a number of other[]" factors impacting the decision and that there were "a variety of reasons." Of particular importance, Sussman testified that the government had made no explicit or implicit statement that his clients should not meet with defense counsel. Accordingly, the district court did not clearly err

---

[62] We know of no Fifth Circuit precedent on this question. In fact, only one unpublished decision, United States v. Nelson, 242 F. App'x 164, 170-71 (5th Cir. 2007), even addresses Rule 804(b)(6).

[63] Skilling also argues that the district court should have ordered a full evidentiary hearing regarding each allegation of misconduct based on these declarations. However, he has waived that argument for failure to brief it adequately. See FED. R. APP. P. 28(a)(9) (noting that briefs must include "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies" and "a concise statement of the applicable standard of review"); United States v. Lindell, 881 F.2d 1313, 1325 (5th Cir. 1989) (holding that a party waives an argument that it inadequately briefed). Instead, Skilling merely argues in his brief that, at the very least, the district court should have held an evidentiary hearing. Although he cites to several cases from outside of this circuit, he fails to provide sufficient legal argument for this court to consider his claim. Unbriefed issues include the following: When is a district court obligated to hold an evidentiary hearing? What is the standard of review? Are there any relevant Fifth Circuit cases? If the absence of these basic elements of an appellate argument constitutes waiver in typical cases, waiver applies all the more where, as here, a party is given leave to file approximately 550 pages of briefing.

in concluding that the government had not substantially interfered with Skilling's ability to interview Sussman's clients.

Likewise, Skilling claims that the government improperly persuaded Michael Anderson ("Anderson"), another former Enron employee, not to cooperate. Prosecutors allegedly did so by having an FBI agent threaten Odom, Anderson's lawyer, warning Odom not to talk to Skilling and his lawyers because "those are bad guys." Concerned, the district court held an evidentiary hearing to question Odom.

Although Odom testified that it "might" have been a factor "that the Task Force might not [have] take[n] kindly" if Anderson cooperated, the testimony, taken as a whole, amply demonstrates that unlawful intimidation did not drive Anderson's decision not to meet with Skilling. Odom, for instance—aside from not definitively stating that such a concern was even a factor at all—testified that "[t]here [were] many factors" that he considered in advising his client and that he did not know whether the "bad guys" statement referred to the defendants or to their lawyers. He also had no additional firsthand information about any prosecutorial threats. This evidence supports the district court's express finding that the government did not substantially interfere with Skilling's ability to interview Anderson.

B.    Plea Agreements

Skilling asserts that the government's plea agreements with Merrill Lynch and Canadian Imperial Bank of Commerce ("CIBC") improperly forbade witnesses from cooperating with his defense. He claims that the agreements prohibited witness testimony from any employee who would contradict the terms of the agreement, that the agreements prohibited meetings between the defense and witnesses out of the presence of the prosecution, and that the agreements did not permit information-sharing between the defense and employees of Merrill Lynch or CIBC. None of these alleged errors require reversal.

Assuming, arguendo, that the plea agreements created some ambiguity, leading potential witnesses to conclude that the plea agreements forbade their cooperation with the defense, the district court's letter to the witnesses clarified the government's position and eliminated any potential confusion or misunderstanding.[64] The district court stated that the witnesses—even those subject to a plea agreement—were free to testify on Skilling's behalf at trial. Thus, although the corporations could not take a position contrary to the plea agreement, their employees, acting in their personal capacities, were free to testify for the defense. The district court also notified potential witnesses that they did not need to seek permission from the government or notify it of meetings with Skilling or his lawyers, and that the district court's letter conveyed the government's consent for the witnesses to meet with the defense to the extent that any plea agreements required such consent. Finally, the district court clarified that the potential witnesses were not limited in what information they shared with the defense. Accordingly, Skilling failed to provide any evidence that the plea agreements were "sufficiently egregious in nature and degree so as to deprive [Skilling] of a fair trial," especially given the manner in which the district court interpreted and clarified the plea agreements. See Weddell, 800 F.2d at 1411.

Skilling also argues that some potential witnesses entered into plea agreements that forbade them from speaking about what they learned from the government, which these would-be witnesses misconstrued as limits on talking about any topic they discussed with the government. Skilling reasons that this confusion evinces unlawful governmental interference. However, the district court's letter mitigated any misunderstanding regarding the contours of the plea

---

[64] As is common with plea agreements, the government retained "sole discretion" to determine whether the agreements were breached. The district court's letter informed potential witnesses that the letter was consistent with the government's position.

agreements. The district court's action was sufficient to allay any concern, especially given that the most natural reading of the agreements is that they restricted only divulging information learned from the government and did not ban talking with Skilling altogether.[65] Thus, the district court did not err in finding that the plea agreements themselves did not substantially interfere with the witnesses' decisions not to speak with the defense, and the district court's letter was sufficient to mitigate any misunderstanding about the plea agreements such that any remaining influence was harmless. See id. at 1410-11 (defining the harmless error standard).

C.    General Allegations of Witness Intimidation

Skilling's next argument is that the government created "a pervasive atmosphere of fear for all witnesses associated with Enron by publicly touting a perpetually 'ongoing' grand jury investigation and maintaining a 100-plus person co-conspirator list." Skilling cites United States v. Peter Kiewit Sons' Co., 655 F. Supp. 73 (D. Colo.), aff'd sub nom. United States v. Carrigan, 804 F.2d 599 (10th Cir. 1986), for support. In Peter Kiewit, "witnesses got the clear mental impression . . . that the prosecutors preferred that these witnesses not talk to defense representatives," and the court ordered the witnesses to submit to depositions by the defense. Id. at 77-78. That case is distinguishable for multiple reasons, the most obvious being the party that prevailed in the district court. There, the district court considered the proffered evidence and found misconduct, id. at 75-78; the appellate court reviewed that finding for clear error

---

[65] In the district court, Skilling also argued that it was illegal for the government to require those who entered into an agreement with the government to agree not to reveal what they learned from the government. Because Skilling did not raise this issue adequately on appeal, however, we cannot consider it. Skilling's cursory argument and references to pleadings in the district court do not preserve the issue. See FED. R. APP. P. 28(a)(9); Lindell, 881 F.2d at 1325.

in the defendant's favor, Carrigan, 804 F.2d at 604.[66]  Here, the district court found no misconduct, and that finding is also entitled to clear error review, but this time in the government's favor.

The district court determined that the best way to counter any concerns about government retribution was for the court to address those concerns directly through letters to the potential witnesses.  As discussed above, these letters informed potential witnesses that they could cooperate with Skilling without reprisal from the government and that the witnesses could speak with the court if they remained concerned.  That is more than sufficient, especially given the court's finding that there was no credible evidence of actual unlawful intimidation.

Moreover, the government is always entitled to investigate and punish criminal conduct.  See United States v. Viera, 839 F.2d 1113, 1115 (5th Cir. 1988) (en banc).  Nothing in the record indicates that the government extended or enlarged its ongoing investigation to intimidate witnesses.  The government obviously could not use its prosecutorial power to intimidate potential witnesses into refusing to consult with Skilling, see United States v. Dupre, 117 F.3d 810, 823 (5th Cir. 1997), or to badger them into silence by meritless perjury threats, see Viera, 839 F.2d at 1115, but there is nothing in the record to suggest that Skilling did not receive a fair trial because of government intimidation.

Skilling further argues that the fact that so many people chose not to cooperate with the defense means that the government must have done something nefarious, because "the proof was in the pudding."  However, Skilling fails to present any direct evidence of witness intimidation.  Thus, United States v. Hammond, 598 F.2d 1008, 1012 (5th Cir. 1979), which Skilling cites, is not on

---

[66] Although Carrigan involved a petition for a writ of mandamus, meaning that the court reviewed the district court's order for a clear abuse of discretion, see 804 F.2d at 602, the court expressly stated that it "[could not] say that the [district] court's findings of fact are clearly erroneous," id. at 604.

point, because there the defendant presented direct evidence of witness intimidation. In that case, an FBI agent actually approached a defense witness and threatened him with "nothing but trouble" in a different proceeding if he "continued on" in the defendant's trial. Id. By contrast, here there is no direct evidence of witness intimidation. Hammond does not require this court to find an inference of intimidation arising from the lack of cooperating witnesses, so the mere fact that many witnesses chose not to cooperate with Skilling does not prove substantial interference with the witnesses' free and unhampered choice to testify. See id. at 1013.

## D.    Specific Allegations of Witness Intimidation

In addition to the general challenges discussed above, Skilling offers specific evidence relating to several witnesses. He alleges that the government contacted these witnesses and implicitly suggested retaliation if they cooperated with Skilling's defense.

For example, Skilling points to an email that the government sent to a lawyer for Rice, a former CEO of EBS who refused to speak to Skilling. Skilling contends that Andrew Weissmann ("Weismann"), a top prosecutor, emailed one of Rice's attorneys, informing him that another of Rice's attorneys, Dan Cogdell ("Cogdell"), an experienced defense attorney, was communicating with Skilling's attorneys. Weissman suggested that if Cogdell was acting against Rice's interest, Rice should "get[] rid of him."

The government responds that it sent the email because of a potential conflict of interest between Cogdell and Rice, given that Cogdell represented a number of Enron-related defendants with arguably divergent interests. Weissmann offered the court a declaration to that effect, saying that in his "experience as a prosecutor, it is unusual for one lawyer to represent multiple targets in an investigation while also representing a cooperating witness." Skilling argues that this explanation is merely pretext for an unconstitutional

64

threat and that there was no good reason to worry about Cogdell's representation. Another of Rice's attorneys filed a declaration saying that the government's communications played no part in Rice's decision not to meet with Skilling.

Given the statement from Rice's lawyer that the email did not affect Rice's decision on whether to cooperate with the defense, we cannot conclude that the email was an improper threat. Even if it was in fact a threat, it was sufficiently ambiguous that we cannot say confidently that its real purpose was intimidation as opposed to something more benign.[67] Under clear error review, we do not second-guess the district court's factual finding in these ambiguous circumstances.

Skilling also contends that the government threatened Tim Belden ("Belden"), another former high-level Enron employee, with reprisal if he spoke with Skilling, even going so far as telling him to take the Fifth Amendment if called to testify. The evidence Skilling offered, however, was merely a statement from one of Skilling's attorneys that supposedly represented what one of Belden's attorneys had said. As explained above, the court did not err in failing to credit those hearsay declarations. Moreover, Belden's attorney expressly denied to the court that the government had threatened Belden. All of this, in conjunction with the court's order and letter to the witnesses, is sufficient to show that the court's finding of no prosecutorial misconduct was not clearly erroneous.[68]

---

[67] Weissmann would have done well to have brought the issue to the court's attention instead of emailing Rice's lawyer.

[68] Skilling contends that additional evidence in the supplemental record shows that the government ordered Belden not to contact any of his former colleagues. Skilling offers as evidence an email in which Belden's attorney asked for permission for Belden to send Christmas cards. Skilling did not present that evidence to the district court, and "[i]t is our well-settled rule that 'issues raised for the first time on appeal are not reviewable by this court unless they involve purely legal questions and failure to consider them would result in

Skilling further contends that the government made "veiled threats" to the lawyer for Mark Palmer ("Palmer"), a former Enron spokesperson. Palmer's lawyer declared that an FBI agent contacted him before Palmer's testimony in another Enron-related trial, saying it was "not in [Palmer's] best interest" to testify for the defense, because one of the defendants might try to shift the blame onto him. As the government observed, however, Palmer testified at the other trial, suggesting that the government's intimidating misconduct—if it were in fact misconduct—did not interfere substantially with Palmer's free and unhampered choice to testify. See Thompson, 130 F.3d at 687 (suggesting that a witness's decision to testify, after a warning from FBI agents that he could be arrested and jailed for perjury if he did not tell the truth, indicated that the FBI's statements did not deter the witness from testifying). Moreover, because the evidence of alleged misconduct occurred in a separate trial, an additional inference is necessary to tie any governmental interference in that case to this one: namely, that if the government interfered there, it also must have done so here. In light of the paucity of more definite evidence, there is no clear error.[69]

---

manifest injustice.'" Diaz v. Collins, 114 F.3d 69, 71 n.5 (5th Cir. 1997) (quoting Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991)). Because the issues surrounding the email involve questions of both law and fact, we cannot review this particular argument.

Skilling also avers that a voicemail transcript of a phone call from Weissmann to the lawyer for David Duncan, an Arthur Andersen partner, suggests prosecutorial abuse. Again, Skilling failed to present that transcript to the district court, and for the same reasons, we cannot address it.

[69] Skilling also points to evidence suggesting that the government called Larry Ciscon's lawyer three times in the two weeks leading up to his scheduled testimony in another Enron-related case to reiterate that he was still a "target." Skilling contends that this shows that governmental interference was responsible for Ciscon's choice not to cooperate with Skilling. Skilling also argues that the government told Rex Shelby that it would not be a "good idea" to speak with the attorneys for Joe Hirko (a co-CEO of EBS) in another related case. These claims are similar to the one involving Palmer and have the same result. Moreover, for both Ciscon and Shelby, as with Belden, Skilling did not even ask the court to send its letter urging witnesses to cooperate and not to fear retribution.

Similarly, Skilling argues that the government, in another Enron-related trial, changed the status of former Arthur Andersen employee Kate Agnew ("Agnew") from "witness" to "subject" and threatened her with perjury, thus causing her not to testify. Skilling apparently learned of this threat from one of Agnew's former attorneys. One of her current attorneys, however, filed a declaration stating that the former attorney's allegations were not true, that "Ms. Agnew does not want to meet with or be interviewed by [Skilling's] counsel," and that her decision was "not based on any concern or fear regarding possible prosecutorial intimidation or retaliation." If the government's actions did not interfere substantially with Agnew's decision not to testify, then there is no violation of Skilling's right to a fair trial. Cf. id. (noting that the defendant "failed to make the necessary showing that the government's actions interfered substantially with [the witness's] free and unhampered choice to testify" (internal quotation marks omitted)). The district court's finding as to Agnew is not clearly erroneous.

In sum, the district court did not clearly err in finding that Skilling failed to show that any governmental misconduct interfered substantially with his ability to communicate with potential witnesses or otherwise to present his defense.

## VII. Suppression of Exculpatory Evidence

Under Brady v. Maryland, 373 U.S. 83 (1963), the government may not withhold evidence that is favorable to a criminal defendant. United States v. Walters, 351 F.3d 159, 169 (5th Cir. 2003). Skilling asserts that the government violated Brady in three ways. First, he alleges that the government withheld material information regarding Fastow's plea agreement. Second, Skilling contends that the government's use of an open file to satisfy its Brady disclosure obligation was legally insufficient. Third, Skilling alleges that the government

provided him with summaries of FBI interviews with Fastow that did not accurately reflect what Fastow had told government investigators. Having reviewed the record, we find no Brady violations.

To establish a Brady violation, a defendant must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable, such as exculpatory or impeachment evidence; and (3) the evidence was material. See Mahler v. Kaylo, 537 F.3d 494, 499-500 (5th Cir. 2008). Moreover, a defendant must establish that his or her failure to discover the evidence was not the result of a lack of due diligence.[70] See United States v. Mulderig, 120 F.3d 534, 541 (5th Cir. 1997); United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990). Where a defendant fails to establish any one element of Brady, we need not inquire into the other components. See United States v. Runyan, 290 F.3d 223, 245 (5th Cir. 2002); United States v. Hughes, 230 F.3d 815, 819 (5th Cir. 2000).

Of the Brady components, materiality "is generally the most difficult to prove." Mahler, 537 F.3d at 500. In assessing materiality, we must determine "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004) (quoting Strikler v. Greene, 527 U.S. 263, 290 (1999)). As this court has summarized the materiality inquiry,

> [t]he Supreme Court has imposed four criteria for determining whether evidence is material. First, materiality does not require the defendant to demonstrate by a preponderance of the evidence that omitted evidence would have resulted in acquittal. Second, he need not weigh the withheld evidence against the disclosed evidence to show he would have been acquitted by the resulting totality. Third, if evidence is found material, there is no need to conduct a harmless error analysis. Fourth, the withheld evidence should be considered as a whole, not item-by-item.

---

[70] Some of our cases have treated this "due diligence" requirement as a fourth element of a Brady claim. See, e.g., Walters, 351 F.3d at 169.

DiLosa v. Cain, 279 F.3d 259, 263 (5th Cir. 2002) (citing Kyles v. Whitley, 514 U.S. 419, 434-37 (1995)). We concluded that "[t]he sum of these four guideposts means that to show a due process violation when the state withholds evidence, a defendant need not prove that his trial necessarily would have had a different outcome; a lack of faith in the result is sufficient." Id. Additionally, materiality depends largely on the value of the suppressed evidence relative to evidence that the government disclosed. Sipe, 388 F.3d at 478.

We review Brady questions de novo. See, e.g., Runyan, 290 F.3d at 245; Hughes, 230 F.3d at 819. As a preliminary matter, we note that Skilling has alleged several Brady violations that are not properly before this court. Skilling never raised these claims to the district court, and some of his arguments rely on evidence that was never before the district court. As we noted in United States v. Gonzales, 436 F.3d 560, 580 (5th Cir. 2006), "Brady challenges present fact-based judgments that cannot be adequately first made on appellate review. That is why Brady challenges must be brought to the district court's attention, winnowed by the trial judge, and made part of the record through a motion for new trial." That is, the proper avenue for a defendant to raise claims such as these would be a motion for a new trial under Federal Rule of Criminal Procedure 33. Thus, as we note throughout, we will not address Skilling's claims that he did not sufficiently bring to the district court.

A.    Fastow's Plea Agreement

In his plea agreement, Fastow agreed to a sentence of ten years, and the government promised not to make any motion for a reduction in sentence. At trial, the government bolstered Fastow's credibility by emphasizing that he had no reason to lie because he would be spending ten years—and no less—in prison. After Skilling's conviction, however, a judge sentenced Fastow to approximately six years. Based on the disparity between the amount of time the government told the jury Fastow would serve and Fastow's actual sentence, Skilling alleges

two distinct but related Brady violations: (1) that the government improperly bolstered Fastow's trial testimony and (2) that the government and Fastow had an undisclosed side deal regarding Fastow's testimony.

Skilling did not raise his first claim in the district court. As Skilling presents this claim as a Brady violation, we cannot address it for the first time on appeal. See Gonzales, 436 F.3d at 580. Even if we could, Skilling's argument is conceptually flawed. He essentially argues that the government suppressed the fact that Fastow's sentence was not irrevocably and inevitably fixed at ten years. Skilling's argument cannot proceed past step one, however, because there was nothing that the government suppressed. Skilling knew, or at least should have known, that a sentencing court could reduce Fastow's sentence pursuant to United States v. Booker, 543 U.S. 220 (2005). We do not dispute Skilling's assertion that the government "had to know" that Fastow's sentence could possibly be less than ten years. Yet Skilling also had to know this, and thus the government did not suppress anything. See Runyan, 290 F.3d at 246 ("Evidence is not 'suppressed' if the defendant knows or should know of the essential facts that would enable him to take advantage of it." (internal quotation marks omitted)); United States v. Dixon, 132 F.3d 192, 199 (5th Cir. 1997) ("Brady does not obligate the government to produce for a defendant evidence or information already known to him, or that he could have obtained from other sources by exercising reasonable diligence." (alteration and internal quotation marks omitted)); United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980) ("In no way can information known and available to the defendant be said to have been suppressed by the Government."). With such knowledge, Skilling could have objected if he felt that the government's characterization of Fastow's plea agreement was inaccurate, or he could have raised this issue on cross-examination.

Skilling's second claim is not properly before this court because the district court never considered any evidence of an undisclosed side deal for accuracy or materiality.[71]  A Rule 33 motion for a new trial would be the proper avenue for a defendant to bring this type of claim.

Because the government did not suppress any information regarding Fastow's sentence, we need not address its materiality.

B.      Use of an Open File

Skilling next asserts that the government's use of an open file failed to satisfy its Brady obligation to disclose material evidence.  Skilling contends that the government's open file, which consisted of several hundred million pages of documents, "resulted in the effective concealment of a huge quantity of exculpatory evidence."  As the government never directed Skilling to a single Brady document contained in the open file, Skilling argues that the government suppressed evidence in violation of Brady.

As a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence.  See United States v. Mulderig, 120 F.3d 534, 541 (5th Cir. 1997); United States v. Mmahat, 106 F.3d 89, 94 (5th Cir. 1997) ("[T]here is no authority for the proposition that the government's Brady obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over."), overruled in part on other grounds by United States v. Estate of Parsons, 367

---

[71] Skilling contends that he raised this issue in the district court.  The only reference he provides for this assertion, however, is a brief mention of Fastow's sentencing in his petition for bail pending appeal.  This is insufficient.  Skilling did not squarely raise the issue of this Brady claim or move to reopen the verdict.  He did not request an evidentiary hearing and never referenced any legal authority.  Skilling never called upon the district court to decide whether the government had violated Brady, and consequently, he never properly raised the issue in the district court.  Cf. United States v. Cohen, 60 F.3d 460, 462 (8th Cir. 1995) (holding that the defendant did not preserve a claim for a breach of a plea agreement where the defendant referenced the alleged breach in his motion for release on bail pending appeal but the district court never ruled on the claim).

F.3d 409 (5th Cir. 2004) (en banc); Marrero, 904 F.2d at 261 ("While the Supreme Court in Brady held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case."); see also Runyan, 290 F.3d at 246 ("The government is not required . . . to facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshal on their own." (internal quotation marks omitted)). Further, where potentially exculpatory information is available to the defendant through an exercise of due diligence, there is no suppression for the purposes of Brady. See Kutzner v. Cockrell, 303 F.3d 333, 336 (5th Cir. 2002) ("When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation."); Brown, 628 F.2d at 473 ("[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim.").

Skilling argues, however, that the voluminosity of the government's open file prevented him from effectively reviewing the government's disclosure. He asserts that no amount of diligence, much less reasonable diligence, could have accomplished this task. In Skilling's words, "it would have taken scores of attorneys, working around-the-clock for several years to complete the job." Ultimately, Skilling argues that the government's production of the voluminous open file, as a matter of law, suppressed exculpatory evidence.

There is little case law on whether a voluminous open file can itself violate Brady, and the outcomes of these cases seem to turn on what the government does in addition to allowing access to a voluminous open file. See, e.g., United States v. Ferguson, 478 F. Supp. 2d 220, 241-42 (D. Conn. 2007); United States v. Hsia, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998); Emmett v. Ricketts, 397 F. Supp.

72

1025, 1043 (N.D. Ga. 1975). In the present case, the government did much more than drop several hundred million pages on Skilling's doorstep. The open file was electronic and searchable. The government produced a set of "hot documents" that it thought were important to its case or were potentially relevant to Skilling's defense. The government created indices to these and other documents. The government also provided Skilling with access to various databases concerning prior Enron litigation. Skilling contends that the government should have scoured the open file in search of exculpatory information to provide to him. Yet the government was in no better position to locate any potentially exculpatory evidence than was Skilling.

Additionally, there is no evidence that the government found something exculpatory but hid it in the open file with the hope that Skilling would never find it. Skilling simply makes an unsupported assertion of improper conduct on the part of the government, but he fails to provide sufficient evidence to even hint at such deceit. If there is something exculpatory still in the open file, we must assume—as there is no compelling evidence to the contrary—that the government does not know about it either.

We do not hold that the use of a voluminous open file can never violate Brady. For instance, evidence that the government "padded" an open file with pointless or superfluous information to frustrate a defendant's review of the file might raise serious Brady issues. Creating a voluminous file that is unduly onerous to access might raise similar concerns. And it should go without saying that the government may not hide Brady material of which it is actually aware in a huge open file in the hope that the defendant will never find it. These scenarios would indicate that the government was acting in bad faith in performing its obligations under Brady. But considering the additional steps the government took beyond merely providing Skilling with the open file, the equal access that Skilling and the government had to the open file, the complexity of

Skilling's case, and the absence of evidence that the government used the open file to hide potentially exculpatory evidence or otherwise acted in bad faith, we hold that the government's use of the open file did not violate Brady.

C.    Accuracy of the 302s

During its investigation, the government conducted several hundred hours of interviews with Enron's CFO, Andrew Fastow.  Government agents took almost 420 pages of handwritten notes during these interviews (the "interview notes").  From these notes, the government compiled two FBI Form 302s—one in December 2003 and another in January 2005—that summarized the substance of the interview notes.  Each 302 covered multiple interviews.  The government provided the 302s to Skilling but refused to disclose the interview notes at that time.  The government also refused to provide Skilling with draft versions of the 302s, asserting that they had been destroyed.[72]

The district court refused Skilling's repeated entreaties that the government disclose the interview notes but eventually ordered the government to produce the interview notes for the court to review in camera.  As the district court noted, one of the purposes of the in camera review was to determine whether the interview notes contained any Brady material.  The district court ordered the government to assemble the interview notes into binders (the "Fastow Binders"), indexed by Fastow's trial testimony and cross-referenced to the relevant portions of the 302s and interview notes.  The district court intended to review the interview notes throughout Fastow's testimony and planned to give Skilling access to the notes only if Fastow denied a statement

---

[72] Skilling contends that the destruction of the draft 302s violated Brady.  We need not address this issue at length, for even if the government unlawfully destroyed draft 302s, the government has now provided Skilling with the interview notes.  Because the draft 302s are merely an intermediary step between what Fastow said—recorded in the raw notes—and what the government reported Fastow as saying—recorded in the 302s—any destruction of the draft 302s is immaterial for purposes of Brady.

74

attributed to him in the 302s and the notes differed from the 302s. The government provided the district court with the Fastow Binders, but omitted some pages that are at issue in this appeal.[73] The district court never allowed Skilling to access the Fastow Binders throughout Fastow's testimony and later returned them to the government.

While Skilling's appeal was pending, this court ordered the government to turn over the interview notes in their entirety. Upon reviewing the notes, Skilling contended that they contained exculpatory and impeachment evidence that the government was required to disclose under Brady. This court allowed Skilling and the government to submit supplemental briefing on these issues. At oral argument, we expressed some hesitancy to addressing the Brady issues involving the notes. We suggested that perhaps a motion for a new trial under Rule 33 was a more appropriate forum for these claims, as there was no explicit ruling on these issues in the district court, and some of the interview notes were not included in the Fastow Binders. At the urging of both Skilling and the government, however, we have reluctantly conducted a review of the interview notes that the government originally included in the Fastow Binders. Finding no clear error on the part of the district court, we hold that the government did not violate Brady in refusing to disclose the interview notes.

At oral argument, Skilling suggested that this court could review the interview notes de novo. Skilling is mistaken. Granted, this court normally reviews Brady claims de novo. See Runyan, 290 F.3d at 245. As the government pointed out, however, we apply a different standard when Brady claims come to

---

[73] The parties dispute whether the government acted in bad faith in not disclosing all of the interview notes. Because the district court was never aware of the undisclosed notes, it had no opportunity to address whether the nondisclosure was in bad faith. Just as we are not addressing the undisclosed notes, we will not address whether the government acted in bad faith in not disclosing them. Again, the proper avenue for such an argument would be a motion for a new trial under Rule 33.

us under the somewhat unique procedural posture of the present case. Where a district court has reviewed potential Brady material in camera and ruled that the material was not discoverable, we review the district court's decision only for clear error. See United States v. Holley, 23 F.3d 902, 914 (5th Cir. 1994) ("Here, the district court examined the relevant FBI reports and found that they did not contain discoverable material. We recognize that in situations such as this, much deference should be paid to the trial judge who observed the hours and days of testimony. After reviewing the record and considering Holley's speculation that the FBI reports could have been useful in the cross-examination of several witnesses, we find nothing which leads us to conclude that the district court's conclusion is clearly erroneous.").[74]

The government provided the district court with the Fastow Binders, which contained almost all of the interview notes in question. After Fastow had finished testifying, the district court returned the Fastow Binders to the

---

[74] See e.g., United States v. Williams, 998 F.2d 258, 269 (5th Cir. 1993) ("After an in camera review, the district court concluded that nothing in the Forms 302 would tend to exculpate the defendant, reduce his sentence, or assist him in impeaching a government witness. We find nothing in the record which would cause us to believe that the district court's conclusions were clearly erroneous."); United States v. Mora, 994 F.2d 1129, 1139 (5th Cir. 1993) (affirming a district court's determination that notes were not discoverable under Brady on a finding of no clear error where the government was "[u]ncertain whether [a DEA agent's] notes were exculpatory or of impeachment value," and thus "submitted them to the district court for in camera inspection"); Brown, 628 F.2d at 472 (reviewing the district court's decision for clear error after the court had remanded the case for an in camera determination of whether an IRS investigative file included exculpatory evidence); see also United States v. Trevino, 89 F.3d 187, 190 (4th Cir. 1996) (reviewing a district court's decision that privileged or confidential material did not need to be disclosed under Brady and stating that "[t]he trial court's ultimate conclusion as to whether the information is subject to disclosure—whether the evidence is both material and favorable—may be disturbed on appeal only if it is clearly erroneous" (citing Mora, 994 F.2d at 1139)); United States v. Monroe, 943 F.2d 1007, 1012 (9th Cir. 1991) ("In general, a district court's ruling on the prosecution's duty to produce evidence under Brady is reviewed de novo. When, however, a district court rules on whether a defendant should have access to particular information in a government document that has been produced pursuant to Brady, we review for clear error." (citations omitted)); United States v. Strifler, 851 F.2d 1197, 1202 (9th Cir. 1988) ("We adopt the rule that we will reverse for denial of Brady material from a probation file if, on review of the file, we find that the district court committed clear error in failing to release probative, relevant, material information.").

government, stating, "I don't think [the defense] is going to need them." This indicates that the district court found, albeit implicitly, no Brady material in the Fastow Binders. Cf. United States v. Lampazianie, 251 F.3d 519, 526 (5th Cir. 2001) (suggesting that a district court's evaluation of sealed evidence coupled with a later decision that the evidence remain sealed raised a "reasonable inference that the district court . . . found nothing exculpatory in the relevant documents"). Because the district court reviewed most of the interview notes and found no Brady material, we review the district court's decision regarding those notes for clear error.

Although clear error is the appropriate standard of review, we cannot review Skilling's remaining Brady claims involving the notes that the government did not provide to the district court. For whatever reason, the government did not submit all of the interview notes to the district court, and the district court never had a chance to review these excluded notes for Brady material. As mentioned above, we cannot address an alleged Brady violation for the first time on appeal. The proper avenue for Skilling to raise his claims regarding the notes that were not in the original Fastow Binders would be a Rule 33 motion for a new trial.

The government provided Skilling with 302s summarizing the contents of the interview notes. As noted above, materiality often depends on the value of the suppressed evidence relative to the disclosed evidence; where suppressed evidence is merely cumulative, no Brady violation occurs. Sipe, 388 F.3d at 478 (citing Spence v. Johnson, 80 F.3d 989, 995 (5th Cir. 1996)). In Skilling's case, this means that there was no Brady violation if the information in the 302s is duplicative of that in the interview notes. As we must analyze the materiality of any suppressed, exculpatory evidence cumulatively, we save our materiality discussion until after we have addressed each alleged suppression.

Finally, throughout this section we quote extensively from Skilling's brief, the 302s, and the interview notes. Unless otherwise noted, all alterations, omissions, emphases, and errors are as they appear in these documents. In particular, we have endeavored to present the handwritten interview notes as accurately as possible and have noted when words are illegible.

### 1. Global Galactic

Skilling first claims that the 302s omitted one of Fastow's statements in the interview notes relating to the Global Galactic document. As we mentioned earlier, Global Galactic was Fastow's handwritten list that memorialized the otherwise undocumented side deals between LJM and Enron. In preparation for a meeting with Skilling, Fastow compiled a list of talking points that included the confirmation of Global Galactic. At trial, the government used this talking points list to argue that Skilling was aware of the side deals described in Global Galactic. Fastow testified that he recalled discussing the talking points list with Skilling "pretty completely," and the government introduced the talking points list to credit this testimony.

The interview notes, however, contain a statement from Fastow that he "doesn't think [he] discussed list w/JS."[75] (alteration added). The 302s contain no mention of this statement. This statement, Skilling argues, was valuable impeachment material that the government suppressed in violation of Brady. Skilling also asserts that this statement corroborated his testimony that he did not discuss Global Galactic with Fastow and suggests that the government knowingly presented false testimony. The government responds that the statement is of little impeachment value and was omitted from the Fastow Binders because Fastow made this statement while discussing Enron Wind, a subject unrelated to the trial.

---

[75] It is unclear whether the "list" spoken of refers to Global Galactic or the talking points list.

We find the omission of this statement from the 302s troubling. Perhaps even more troubling is that the government never disclosed the page of interview notes containing this statement to the district court. However, because the district court never had the opportunity to consider this page of interview notes, we cannot address this Brady claim for the first time on appeal. The district court did not assess the materiality of this statement or determine whether its suppression violated Brady. Thus, there is nothing for us to review. Skilling must bring this claim to the district court before we can address it.

2.     The Raptors

As we described above, the Raptors were structured finance vehicles that Enron used to hedge its investments and transfer underperforming assets off of its books. Enron enlisted the Fastow-run LJM, an "independent" third party, to own a portion of the Raptors. The government alleged that a secret side deal, or "quid pro quo," existed between Enron and LJM, meaning that LJM was not an independent third party because its equity was never at risk. Under this quid pro quo, Enron guaranteed LJM that it would recoup its $30 million dollar investment in the Raptors plus $11 million dollars in profit (the quid) and, in return, LJM would let Enron hedge any asset at any price without performing due diligence (the quo). The documents creating the Raptors did not include this secret side deal.

Skilling argues that the government suppressed exculpatory statements that Fastow made regarding the Raptors and posits that Fastow's trial testimony was inconsistent with a number of pages in the interview notes. The government responds that Skilling misunderstands the notes, and we agree.

a.     Whether Arthur Andersen Knew About the Quid Pro Quo

The government asserted that Skilling and Enron hid the quid pro quo from Arthur Andersen. As part of his reliance defense, however, Skilling

claimed that Arthur Andersen was fully informed about and approved the transactions involving the Raptors. At trial, Fastow testified that Arthur Andersen had "checked off on" every aspect of the Raptors except the quid pro quo. This testimony is consistent with the 302s, which indicate that "Fastow believe[d] Enron showed AA the entire deal except for the quid pro quo," (alteration added), and that "Fastow never thought it could have been a problem for AA." Skilling asserts that Fastow's statements in the interview notes are inconsistent with this testimony. In so doing, Skilling either misunderstands or misrepresents the notes.

Skilling points to five statements in particular that he alleges demonstrate Arthur Andersen's knowledge and approval of the quid pro quo. Skilling first asserts that the government improperly withheld the following statement, as he presents it (with his own emphasis) in his supplemental brief:

> They [Rick Causey's group and the many other people working on Raptors] didn't think that QPQ was wrong – Didn't think should be hiding this.

Skilling characterizes "They" as including "many other people working on the Raptors," and implies that this group included Arthur Andersen. Thus, according to Skilling, this note is contrary to the 302s and Fastow's testimony.

Skilling misrepresents this statement. The context of the interview notes indicates that "They" referred to Enron employees, not to Arthur Andersen auditors. Indeed, the sentence just preceding this statement indicates that the statement only referred to members of Rick Causey's group:

> Don't know who else in RC's group knew, But deal not a secret. They didn't think that QPQ was wrong. – Didn't think should be hiding this.

This statement does not indicate that Arthur Andersen knew of the quid pro quo. Further, the 302s relate the information that members of Causey's group knew

about the quid pro quo. Thus, this statement in the interview notes was consistent with the 302s.

Skilling also asserts that the government improperly withheld the following statement from the interview notes, which we copy exactly as it appears in Skilling's supplemental brief:

> Every lawyer involved understood this [quid pro quo]. Not a secret. Never on ASF's mind that hidden from AA.

Again, as the government points out, Skilling misrepresents the interview notes. The interview notes do not indicate that every lawyer involved knew of the quid pro quo, as Skilling's alteration suggests. This statement appears under the heading, "Who knew there was no business purpose to $41 Mil put," referring to the $41 million dollars that Enron guaranteed LJM. In the statement, "Every lawyer involved understood this," "this" refers to the lack of a business purpose. The lack of a business purpose was "Not a secret." Moreover, it was "Never on ASF's mind that [the lack of a business purpose was] hidden from AA." (alteration added). The government included this information in the 302s, which stated,

> Mike Edsall and every other lawyer involved in fashioning the Raptors understood that there was no business purpose for the $41 million put. It was never a secret and Fastow never thought it could have been a problem for AA.

Thus, the government did not suppress any exculpatory information by refusing to disclose this statement in the interview notes.

Third, Skilling asserts error in the government's refusal to disclose the following statements from the interview notes, again copied exactly as Skilling presents them in his supplemental brief:

> QPQ – discussed w/ RC [Causey] + BG [Glisan]. (1) not a secret. No reason not to discuss together. Was built into structure in a way, but not valuation issue. (2) discussed w/ RC, JS [Skilling] + BG. (a) QPQ valuation issue was not a secret to AF – no attempt to conceal.

> What does this say about AA's role. (1) Opinion Ö AA's role was to help EN find ways to navigate through the rules to find a way for EN to get treatment it desired. They did this through a very technical analysis of the rules. (2) Did AA know this was return of money? AF's opinion: AA knew. AA actively helping EN to find ways to navigate around the rules.
>
> AF believed they (AA) were complicit. AF never doubted that EN was sharing _entire_ deal w/ AA.

The first statement, although cryptic, says nothing about Arthur Andersen. Although Skilling appears to emphasize the statements that the quid pro quo was not a secret, these seem to relate only to the fact that it was not a secret to the individuals named in the note. Further, the 302s indicate that both Causey (RC) and Glisan (BG) were aware of the quid pro quo. The 302s also state that Skilling knew that the purpose of the Raptors was to conceal Enron's valuation of the assets. The first statement thus contains nothing regarding Arthur Andersen's knowledge of the quid pro quo, and the 302s disclose the other information.

Skilling takes the second and third statements out of context. Although all three statements are on the same page of interview notes, the second and third statements appear further down the page from the first and are under the separate heading, "What is AF + BG mindset w/ BG says all we have to do is treat it as 'on', not 'of,'" and the subheading, "What does this say about AA's role." These statements concern Arthur Andersen's approval of the $41 million dollars that LJM received from the Raptors. As Enron and LJM originally structured the deal, LJM was to receive the $41 million as a return of capital. Arthur Andersen approved the deal only after this was changed to a return on capital. Thus, the second statement regarding what Arthur Andersen "knew" refers to the improper characterization of LJM's return, not the quid pro quo.

Finally, although Fastow's statement that he believed Enron was sharing the entire deal with Arthur Andersen is facially inconsistent with his statement

82

that Arthur Andersen approved everything except the quid pro quo, the statements are not conflicting when placed in context. This third statement appears in a discussion concerning the treatment of LJM's return. That is, this statement regards only the "quid" portion of the side deal; it says nothing about Arthur Andersen's knowledge of LJM's agreement to accept Enron's asset valuations for hedges. Further, the 302s correctly reflect that Arthur Andersen was aware of the improper treatment of LJM's return:

> AA knew that LJM2 was receiving its capital plus a profit but AA always helped Enron find ways around the rules. AA had to know what was going on, because the deal had already been documented with the $41 million put, failed and was revived by this one change [from "of" to "on"]. AA had to understand what was happening. Fastow believes Enron showed AA the entire deal except the quid pro quo.

(alteration added). Thus, the statements in the interview notes add little to what Skilling already knew from the 302s.


### b. Whether Skilling Knew About the Quid Pro Quo

Skilling next contends that the government suppressed statements indicating that he did not know about the quid pro quo. At trial, Fastow testified that he discussed the quid pro quo with Skilling. But during his first interview with the government about the quid pro quo, Fastow identified only four people—besides himself—who were aware of the quid pro quo. Skilling was not one of those people. Skilling asserts that the government violated Brady by refusing to disclose that Fastow did not mention Skilling during this first interview.

Skilling, however, is mistaken. The government released two 302s, one from December 2003 and one from January 2005. In the first 302, Fastow listed a number of people that knew of the quid pro quo and did not include Skilling. In the second 302, Fastow said that Skilling did know of the quid pro quo.

Skilling should have recognized that Fastow's recollection had changed.[76] Consequently, it is not clear to us that Fastow's failure to mention Skilling during the first interview was even suppressed, much less material.

Skilling also contends that the government should have disclosed a specific statement concerning Skilling's knowledge about the quid pro quo. As Skilling presents this later statement from the interview notes in his supplemental brief,

> Not sure what Skilling knew. Causey + Glisan explained structure to JS [Skilling].
> 1) Told JS that BG [Glisan] solved problem on back end.
> 2) Don't know if JS can say he didn't know about QPQ, but shouldn't matter b/c entire purpose of Raptor is to conceal financials of ENE – This continues through Restructuring etc.

The indication in the undisclosed statement that Causey and Glisan explained the quid pro quo to Skilling suggests exactly what the 302s state: that Skilling understood the quid pro quo. Additionally, the differences between the December 2003 and January 2005 302s mitigate any harm from the nondisclosure of this statement. In later interviews, Fastow repeatedly stated that he discussed the quid pro quo with Skilling. One interview note in particular reads,

> Discussed Quid Pro Quo w/JS during meetings. Information conveyed was to make sure JS understood + approved structures and understood the QPQ.

Based upon this and other statements, the second 302 stated that "Skilling understood the quid pro quo." That is, the December 2003 302 did not list Skilling as having any knowledge of the quid pro quo, but the January 2005 302 did list Skilling as having this knowledge. Thus, the 302s' different statements about who knew of the quid pro quo should have given Skilling adequate warning that there might be inconsistencies in the interview notes. Based on

---

[76] The government explains Fastow's shifting recollection by asserting that Fastow remembered more things as he reviewed additional documents.

this discrepancy, Skilling should have been on notice of Fastow's potentially inconsistent recollection and could have questioned him about this on cross-examination.

> c. Whether Arthur Andersen Approved the Asset Valuations That Were Part of the "Quo"

Skilling also contends that the government suppressed Fastow's statements indicating that Arthur Andersen approved the valuations of assets that Enron hedged in the Raptors. At trial, Fastow testified that LJM allowed Enron to put assets into the Raptors "at whatever level they wanted" without performing due diligence because LJM had no equity at risk. Skilling contends that LJM entered the Raptor transactions not because it had no equity at risk, but because an independent appraiser—Arthur Andersen—approved the valuation. Skilling posits that the interview notes support his assertion. As Skilling states in his supplemental brief,

> In an interview with the Task Force, Fastow conceded he "instructed LJM people to accept [Enron's] valuations" not because LJM2 had no equity at risk, but "b/c [Arthur Andersen] would approve [the] valuations."

(quoting interview notes). Skilling asserts that this statement is inconsistent with the 302s, which stated,

> LJM2 would not do due diligence but simply accepted the valuations on Enron's books. AA had already signed off on these valuations.

Again, Skilling is mistaken. Without alterations, the statement in the interview notes reads,

> AF instructed LJM people to accept ENE valuations b/c AA would approve valuations. AF told LJM people would be accommodating to EN on valuation.

Contrary to Skilling's interlineation, this statement does not contradict the government's assertion that LJM entered into the Raptor transactions because

it had no equity at risk.  Nor is it much different from the 302.  Further, the 302
is consistent with another page of the interview notes:

> Told JS – can't get price on these things – due diligence took to long
> – would use ENE value on books – AA already signed off.

Thus, they are of little exculpatory value.[77]

### 3.    Cuiaba

In September 1999, Enron sold a minority interest in a Brazilian power
plant called Cuiaba to LJM, allegedly to meet its third quarter earnings targets.
According to the government, Skilling promised Fastow that if Enron could not
find another purchaser for Cuiaba, it would buy back the interest from LJM at
a price that would ensure LJM did not lose any money on the deal.  This
guarantee eliminated any transfer risk, rendering Enron's recording of earnings
from the sale improper.  Skilling asserts that the government failed to turn over
relevant portions of the interview notes involving this transaction.

### a.    Whether Skilling Made a Guarantee to LJM

At trial, Fastow testified that Skilling personally gave him the guarantee,
although he admitted that Skilling did not use any words such as "promise."
Skilling contends that the government suppressed a number of statements in the
interview notes that contradict Fastow's testimony.  We address each in turn.

First, Fastow testified that Skilling called Fastow into his office and
pressured LJM into purchasing the interest in Cuiaba.  Skilling suggests that
Fastow's testimony indicates that it was Skilling's idea that LJM purchase
Cuiaba, and that this idea originated during their September 1999 meeting.
One 302 also suggests that the idea originated with Skilling, stating that
"SKILLING wanted LJM1 to purchase interest in Cuiaba."  Skilling contends

---

[77] Skilling attempts to bolster his arguments with Fastow's testimony in litigation that
occurred after Skilling's trial.  For the reasons discussed above, we cannot review this
testimony as evidence of a Brady violation for the first time on appeal.

that the following statement in the interview notes contradicts Fastow's testimony and the 302s:

> May have been AF's idea to have LJM buy + LJM would be considered a hero b/c allowed EN to make #'s.

Skilling thus suggests that the government suppressed information that would have allowed him to impeach Fastow's testimony on this issue.

Even if we take Fastow's testimony and the 302s to indicate what Skilling suggests,[78] he already had information indicating that the idea for LJM to buy Cuiaba might have originated with Fastow. The 302s indicated that Fastow gave Cuiaba as an example of a deal that LJM could do with Enron during a June 1999 presentation to the Enron Board of Directors. This presentation took place months before Skilling and Fastow agreed that LJM would purchase Cuiaba. Thus, the government already disclosed the information in the statement through the 302s.

Second, Fastow testified at trial that Skilling told him that he would not lose any money in the Cuiaba deal. One 302 indicated that "SKILLING gave FASTOW a 'bear hug' which was an assurance that LJM1 would not lose any money on the Cuiaba project." Skilling contends that Fastow's language in his testimony and the 302 are different from that used in the interview notes. In one interview, Fastow reported that Skilling said LJM was "going to be fine." In another interview, Fastow reported that Skilling said "LJM would not get stuck w/ asset – or something similar." Skilling asserts that this variation in language severely calls into question Fastow's ability to recall accurately his conversation with Skilling.

---

[78] It is not clear to us that the 302s indicate that the idea originated with Skilling; they seem to indicate only that Skilling wanted the deal to happen.

Again, Skilling misrepresents the context of the interview notes by selectively quoting from them. One of the notes to which Skilling points, from an interview on January 20, 2004, states,

> Toward end of 3rd Q '99–SA group determined not going to make #s.
> solution was they would sell piece of Cuiaba to LJM – 2–3 wks b/4 end of q – spoke to JS in JS's office. Told JS – Plant had trouble – can't do due diligence. How can get comfortable. JS gave "Bear Hug" – said going to be fine. left room thinking won't lose money. ASF understood Enron would not let LJM lose money on deal – Did not trust that JS would keep word.

In the margin next to this note is written "[illegible] LJM Won't lose [illegible] on' Deal." The other note to which Skilling points, from an interview on January 6, 2004, states,

> Someone figured out selling Cuiaba would fill hole in earnings for 3Q.
> a) Spoke to JS, RC,
> b) Someone suggested LJM buy. Went to JS. Said understood that they want LJM to buy, but it is at end of Quarter and nobody could do the due diligence. JS said LJM would not get stuck w/ asset – or something similar.

From these notes, Skilling points to only the phrases "going to be fine" and "LJM would not get stuck w/ asset – or something similar." Neither of these statements differs much from the statement in the 302s or Fastow's testimony. In context, they all indicate that Skilling actually made the alleged guarantee. The difference in language is of little significance.

Third, Fastow testified that he knew the guarantee, or "bear hug," was wrong. Fastow also testified that the Cuiaba guarantee was the first time that Enron made such a guarantee to LJM. Skilling contends that this testimony is contradicted by Fastow's statement in the interview notes that he "didn't have feeling asking JS to do anything unusual or that hadn't been done." Skilling argues that if there were in fact a guarantee and it were the first such

guarantee, then it would have been unusual and would not have been done before. Skilling thus asserts that Fastow's statement in the interview notes is inconsistent with the government's assertion that Skilling made an unlawful guarantee to Fastow during the September 1999 meeting.

As the government asserts, Skilling again misrepresents the context of this statement. Skilling and Fastow formed LJM to conduct a particular transaction with Enron, and Cuiaba was the first deal thereafter. Thus, Cuiaba was the first opportunity for such a guarantee between Skilling and Fastow. In this context, it is difficult to imagine how Fastow could indicate that such guarantees had been done before; he was discussing the second-ever deal between Enron and LJM. The interview notes confirm this conclusion. The relevant portion of the interview notes reads as follows:

> BANKS:
> Cuiaba:  Thought this was an opportunity for ASF to be hero for ENE.  Want to make sure JS knew this + to get assurance that would not lose money on deal.  JS – AF – you do not have to worry about losing money on deal.  ENE would take any action to enhance opportunity to report deal or conclude a deal.  Didn't have feeling asking JS to do anything unusual or that hadn't been done. Bankers wanted credit for what they did.  Wanted someone at ENE to acknowledge what bank had done.  Rare for bank to do business w/out expectation of "chit" from enron.

In context, the statement indicates that Fastow did not think that it was unusual for Skilling to reward those who had helped Enron conclude a deal, not that the specific promise between Skilling and Fastow was not unusual. The statement is arguably inculpatory, as it indicates that side deals and guarantees were within the normal course of business.

Skilling's remaining argument regarding whether he made a guarantee relies on the statement "JS could have said you are stuck w/ Cuiaba" appearing in one of the interview notes. The district court did not review this note, as the

government failed to include it in the Fastow Binders. For the reasons stated above, we will not address this Brady claim for the first time on appeal.

### b. Whether Skilling Confirmed the Guarantee in a Conversation with Michael Kopper

Fastow testified that Enron was going to repurchase the Cuiaba interest from LJM, but that he wished to avoid any unwelcome scrutiny of the transaction. To do this, Fastow was to nominally transfer his interest in LJM to Michael Kopper, and Kopper then was then to sell the Cuiaba interest to Enron, making it look as if Fastow took no part in the buyback. Fastow also testified that Skilling confirmed to Fastow that Enron would honor the original guarantee. Finally, pursuant to the coconspirator exception to the hearsay rule, Fastow related Kopper's statement that he had spoken with Skilling and that Skilling had confirmed the original guarantee. On these topics, the first 302 stated,

> FASTOW, CAUSEY, and MINTZ all agreed and understood that Enron would honor the original "bear hug" provided by SKILLING after FASTOW disposed of his interest in LJM1. . . . FASTOW may have told KOPPER to talk to SKILLING about the "bear hug" when KOPPER purchased his interest in LJM1.

(omission added). The second 302 stated,

> Cuiaba was included in LJM's sale economics and Kopper knew Enron would repurchase Cuiaba because he spoke to Skilling and Causey about the Cuiaba buy-back. Fastow asked Skilling to make Kopper comfortable with buying LJM and assure Kopper that Enron would continue to do deals with LJM. Fastow is uncertain whether he specifically mentioned Cuiaba when he asked Skilling to meet with Kopper.

Skilling contends that the government suppressed evidence in the interview notes relating to Kopper and these transactions. In particular, Skilling points to the following statement in the interview notes:

> AF might have told MK to talk to JS about buyout. AF doesn't know if MK went to talk w/ JS.

Skilling argues that the statement that Fastow "doesn't know" if Kopper spoke with Skilling contradicts Fastow's testimony and the 302s, and thus should have been disclosed. Skilling asserts that the government's nondisclosure of this statement makes it "obvious" that the government "manufactured the entire Skilling-Kopper conversation and intentionally distorted the evidence to prove it."[79]

Once again, Skilling overstates his claim. The interview notes on which Skilling focuses are consistent with the first 302, which indicates that Fastow might have told Kopper to speak to Skilling. The lack of any information about whether Kopper followed up on what Skilling might have recommended indicates that Fastow did not know whether Kopper actually met with Skilling. Further, the statement in the second 302 that Kopper did in fact speak with Skilling, when juxtaposed against the statement in the first 302, indicates that Fastow's recollection might have changed. Skilling thus could have questioned Fastow about his changing recollection of these events.

4. Nigerian Barges

According to the government, Enron wished to unload its interest in energy-producing barges moored off the coast of Nigeria. Although Fastow at first was reluctant to have LJM buy the barges, Fastow testified that Skilling again gave him an implied guarantee, or "bear hug," that LJM would not lose money in the deal. Fastow thus agreed to purchase the barges, if necessary, but wished to wait six months. To keep the barges off of its books for the interim, Enron purported to sell the barges to Merrill Lynch. Fastow secretly guaranteed

---

[79] In support of this assertion, Skilling relies on statements contained in Kopper's 302. This document is not in our record, and there is no indication that Skilling presented it to the district court. Indeed, Skilling stipulates that he obtained access to the document only recently when "counsel in another matter provided it to Skilling on the condition that [he] could use it solely in connection with [his supplemental] brief and for no other purpose without further approval." Even if we could confirm the statements that Skilling says are in Kopper's 302, we could not consider this alleged Brady evidence for the first time on appeal.

to Merrill Lynch that it would receive a certain rate of return on the investment, that Enron would seek a third-party buyer, and that Enron would ensure that Merrill Lynch had resold the barges within six months. Because these guarantees prevented Merrill Lynch from having any equity at risk, this transaction was fraudulent. Skilling alleges that the government withheld exculpatory information from the interview notes regarding this deal.

### a. Whether Skilling Made a Guarantee to Fastow

Skilling faults the government for not disclosing that, during five interviews regarding the barges deal, Fastow never asserted that Skilling gave him a "bear hug" or other guarantee. The interview notes upon which Skilling relies for this argument, however, are consistent with the 302s. Nowhere in the relevant portions of the 302s does Fastow assert that Skilling guaranteed that Fastow would not lose money on the barges deal. The only portion of the 302 that might be read as such a guarantee states,

> Fastow was comfortable with Skilling's assurance that he would not be stuck with the Nigerian barges. He wanted the assurance from Skilling, because he could rely on it.

Yet this statement does not clearly indicate that Skilling gave Fastow a guarantee. Indeed, it instead reflects the interview notes quite accurately:

> In Barges conversation. Due to discussion w/ JS. Comfortable would not be stuck with Barge.

Skilling does not point to anywhere in the 302s where Fastow indicated that Skilling gave him a guarantee concerning the barges deal. Thus, just as the interview notes did not contain any indication that Skilling guaranteed that LJM would not lose money on the barges deal, neither did the 302s. Skilling did not need the interview notes to attack Fastow's testimony on this issue.

### b. Whether Fastow Made a Guarantee to Merrill Lynch

To corroborate Fastow's testimony on the guarantee to Merrill Lynch, the government introduced two documents: an email from Ben Glisan to Enron

employees and a document titled "Benefits to Enron," which concerned the barges deal. Upon being shown these documents, Fastow testified that they "reflected" his "guarantee to Merrill Lynch." Skilling contends that the government did not disclose interview notes wherein Fastow indicated that these documents were "not consistent" with his understanding of the barges deal, which Skilling argues directly contradicts Fastow's testimony.

The Glisan email stated, "To be clear, Enron is obligated to get Merrill out of the deal on or before June 30." The interview notes report that Fastow stated the following upon reviewing the email:

> Next Email – from BG, 5/11/00
> 1) Did not see Email b/4 today. Object to word obligated. Not bothered that it is ENE w/ obligation.

Skilling argues that the government improperly withheld Fastow's statement that he objected to the word "obligated" in the Glisan email.

The Benefits to Enron document stated that "Enron sold barges to Merrill Lynch in December 1999, promising that Merrill would be taken out by sale to another investor by June 2000." The interview notes report that Fastow stated the following upon reviewing the Benefits to Enron document:

> Benefits to Enron Summary – [illegible]
> 1) The 1st Paragraph – Description of transaction.
> 2) Summary not consistent w/ AF's memory b/c not word "promise"
> 3) It was EN's obligation to use "best effort" to find 3rd Party takeout + went on to say there would be 3rd party b/c AF is manager of 3rd Party.
> > a) B/C of ENE's course of action over years would have taken ML out.
> > b) Phone call did not obligate ENE to buy out, Did not intend to bind ENE, was binding LJM to do something. LJM was 3d party + was already found.
> 4) "Best Efforts" – must do everything possible that a reasonable businessman would do to achieve result.
> > a) Best effort different from guarantee b/c still obligated to perform. Best effort would be to find 3rd party to accomplish buyout.

93

> 5) Could have said "Promise to use best efforts" but don't recall saying that.

Skilling contends that the government improperly withheld Fastow's statement that the Benefits to Enron document was inconsistent with his memory because it used the word "promise." In addition to arguing that this statement contradicts Fastow's testimony, Skilling alleges that disclosure would have bolstered his theory of the case and supported his jury instructions argument.

The 302s, however, effectively disclosed the information in these statements. Skilling knew of the content of the interview notes concerning the Glisan email based upon Fastow's repeated statements in the 302s that Enron would not repurchase the barges, because LJM would instead. That is, the 302s did not indicate that Enron was obligated, which is consistent with the information in the interview notes. Thus, Skilling already had the information necessary to challenge Fastow's statement that the email "reflected" the guarantee.

As to the Benefits to Enron document, the 302s make clear that Fastow did not use the word promise because he did not need to. According to the 302s, anyone listening would have realized that Fastow was making a promise without using the actual word. Further, the statement that Enron would use its best efforts to secure a purchaser is not at odds with the 302s, particularly the statements that "FASTOW thinks there was every intention that Enron would find a buyer for ML" and "ML could have a high level of confidence that an entity was interested in the barges and that entity, LJM, would buy the barges after six months." In other words, it was not Enron itself that was formally bound to buy the interest from Merrill Lynch; LJM would do so if Enron's "best efforts" did not result in another buyer. Again, Skilling had all the information necessary to challenge Fastow's testimony that the Benefits to Enron document "reflected" the guarantee.

### c. Corroboration of Guarantee to Merrill Lynch

Ben Glisan and Chris Loehr both worked for Fastow, and their testimony corroborated the existence of a guarantee to Merrill Lynch. Skilling asserts that the government improperly refused to disclose notes that reveal, in Skilling's words, that

> Fastow explained to the Task Force that he lied to "subordinates" by "tell[ing] Enron people this was a guarantee" in order to "motivate" and "light a fire" within Enron to remarket the barges to a third-party.

Skilling argues that the notes reveal that Fastow lied to subordinates, including Glisan and Loehr. If Fastow had lied to Glisan and Loehr about the existence of a guarantee, so the argument goes, their knowledge of the guarantee could have been based entirely on lies. If that were the case, Skilling could have used that information to undermine their testimony.

Skilling again misrepresents the interview notes. Nowhere in the notes to which Skilling points does Fastow admit to "lying" to subordinates. The relevant portion of the interview notes reads,

> w/ Subordinates
> 1) Probably used a shorthand word like promise or guarantee as
> 2) Internally at Enron. AF, JM + BG would tell Enron people that there was a guarantee so to light a fire under Int'l people – so it should be in paperwork.
> 3) On phone call, didn't say EN would buy back, – Rep of 3rd Party. Explicit. Internally said Enron would buy back. Unit less motivated if knew of LJM. "Enron will take necessary steps to make sure you are out of this by June 30." ☺ Reasonable for person on other end to think Enron.

This statement does not contradict Fastow's assertions that he made an implicit guarantee to Merrill Lynch. Immediately preceding these notes, Fastow discussed the guarantee with Merrill Lynch extensively, repeatedly noting that he had made a guarantee in everything but name and was avoiding the word to

protect the accounting treatment. Thus, he was not necessarily lying when using words like "promise" or "guarantee" with his subordinates.

Further, these notes do not support Skilling's argument that Glisan and Loehr based their testimony only upon Fastow's lies. First, the notes report Fastow as saying that "BG," presumably Ben Glisan, was party to the plan to "tell Enron people that this was a guarantee." As Skilling bases his argument that Fastow "lied" to Glisan upon this statement, it is difficult to understand how it indicates that Fastow lied to Glisan about something which they were then both supposed to lie about to "Enron people." That is, it is unlikely that Glisan was confused about the nature of the deal as a whole if he was also lying to the "Enron people." Second, Loehr worked at both Enron and LJM, and he offered explicit testimony about the intricacies of the Enron/LJM interactions, so it is unreasonable to conclude that he was tricked by Fastow's alleged lie. Therefore, it is unlikely that Skilling could have used this statement to impeach either corroborating witness.

D.    Materiality

As noted above, when a defendant alleges multiple Brady violations, we must consider the materiality of all suppressed evidence cumulatively. As a preliminary matter, we note that Skilling has failed to establish that the government even suppressed some of the information at issue. The materiality of any non-suppressed information is irrelevant to our cumulative analysis. See Sipe, 388 F.3d at 493 (Smith, J., dissenting). Thus, we consider only the cumulative materiality of the undisclosed interview notes that the government included in the Fastow Binders, not Skilling's arguments concerning Fastow's plea agreement or the government's use of an open file. Further, a few of Skilling's alleged Brady violations are not properly before this court because the

district court did not consider them.[80] They, too, are irrelevant to our cumulative analysis.[81]

Considering that we are reviewing the district court's determination that these interview notes did not contain any Brady material only for clear error, we need not dwell long on materiality. Skilling has established that there are some differences between the interview notes and the 302s. Yet none of the undisclosed statements are particularly material, and many are wholly immaterial. For several of Skilling's allegations, he has misunderstood—or misrepresented—the contents of the interview notes. For others, the government has presented a reasonable argument as to why the undisclosed statements are of little or no materiality. We therefore hold that Skilling has failed to establish any violations of Brady.

## VIII. Sentencing

Skilling challenges various aspects of his sentence. In particular, he disputes the district court's application of the Sentencing Guidelines and the reasonableness of his sentence under 18 U.S.C. § 3553(a). Because we decide that the court committed error in applying the Guidelines, we do not reach the § 3553(a) requirements, as proper calculation of the Guidelines range is antecedent to a reasonableness challenge. See Gall v. United States, 128 S. Ct. 586, 596-97 (2007).

---

[80] Skilling attached an appendix to his supplemental brief containing additional examples of allegedly suppressed and exculpatory evidence. The district court did not consider four of these examples, and thus we cannot review them on appeal. In any event, "arguments may not be properly raised by incorporating them by reference from the appendix rather than discussing them in the brief." Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1385 (Fed. Cir. 1998) (applying what was then Federal Rule of Appellate Procedure 28(a)(6)). Thus, we do not address the statements in Skilling's appendix.

[81] We note, however, that another court properly considering these other alleged Brady violations may have to consider their cumulative materiality, if any, alongside the materiality of the alleged Brady violations that are now properly before us.

Under the 2000 Sentencing Guidelines, Skilling had a base offense level of 6, which the district court subsequently enhanced to 40. With a criminal history category of I, that yielded a sentencing range under the Guidelines of 292 to 365 months' imprisonment. Skilling objected to some of the enhancements at sentencing. The court rejected those objections and sentenced Skilling at the bottom of the advisory range, or 292 months. On appeal, Skilling specifically objects to the two-level enhancement for obstruction of justice, pursuant to U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 3C1.1 (2000), and the four-level enhancement for substantially jeopardizing the safety and soundness of a financial institution, pursuant to U.S.S.G. § 2F1.1(b)(8)(A) (2000). We review the application and interpretation of the Guidelines de novo. United States v. Solis-Garcia, 420 F.3d 511, 514 (5th Cir. 2005).

A. Obstruction of Justice

The court enhanced Skilling's sentence pursuant to U.S.S.G. § 3C1.1[82] for obstruction of justice based on testimony Skilling gave to the SEC on December 6, 2001. Skilling stated that he had sold stock on September 17, 2001, solely because of the terrorist attacks of September 11, 2001. The court determined that this statement was perjury, because a preponderance of the evidence showed that Skilling had tried to sell stock before the attacks, on September 6.

---

[82] Section 3C1.1 provides,

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

The Sentencing Guidelines specifically mention perjury as a type of conduct that constitutes obstruction of justice. U.S.S.G. § 3C1.1 cmt. 4(b).

Skilling does not argue, however, that the court erred in finding perjury before the SEC. Rather, he reasons that the court could not use the testimony at all because the SEC and the Department of Justice were improperly collaborating.[83]

Skilling relies on United States v. Tweel, 550 F.2d 297, 299-300 (5th Cir. 1977), for the proposition that when an agency deliberately misleads someone whom it is investigating, it invariably taints any consent that the person under investigation provides, requiring suppression of the evidence. The Supreme Court and other circuit courts have made similar statements.[84] It follows that if the district court should have suppressed the evidence of Skilling's testimony before the SEC, then § 3C1.1 cannot apply in this case. However, the case law does not support the premise that the district court had to suppress this evidence at sentencing.

Skilling avers that the district court believed that the Enron Task Force and SEC had merged into one prosecutorial team and that the SEC had acted on the Task Force's behalf in connection with Skilling's criminal case. Assuming that they had in fact merged, and that by the time of his testimony the SEC was deliberately misleading Skilling as to the nature of the investigation, the issue

---

[83] The government suggests that Skilling waived this argument because he failed to object to the use of this testimony at sentencing. Skilling counters by drawing our attention to his written objections to the presentence investigation report, in which he disputed the enhancement. In particular, he stated that because he "was not aware of an investigation 'against him' at the time he testified before the SEC, his testimony before that body cannot, as a matter of law, trigger the obstruction adjustment." We need not decide this issue, because we find no error in the court invoking this enhancement.

[84] See, e.g., United States v. Kordel, 397 U.S. 1, 11-13 (1970); United States v. Grunewald, 987 F.2d 531, 534 (8th Cir. 1993); United States v. Robson, 477 F.2d 13, 18 (9th Cir. 1973).

of whether the results of the investigation could be used at sentencing remains open.

Ordinarily, a district court can consider illegally obtained evidence at sentencing even if that evidence is not admissible at trial, United States v. Robins, 978 F.2d 881, 891 (5th Cir. 1992), although there may be exceptions. For example, we have approvingly cited Verdugo v. United States, 402 F.2d 599, 611-12 (9th Cir. 1968), for the proposition that on a case-by-case basis, it might be improper for a district court to consider certain evidence at sentencing. See Robins, 978 F.2d at 891. This is particularly true where "the use of illegally seized evidence at sentencing would provide a substantial incentive for unconstitutional searches and seizures." Verdugo, 402 F.2d at 613. In other words, we may look, case-by-case, to whether the admission of the evidence will encourage the government to obtain evidence illegally.

This principle cuts against Skilling. Admitting the evidence of his perjury for purposes of sentencing will not encourage the government to conduct improper parallel investigations or unconstitutional searches. The parallel-investigation cases ordinarily involve a defendant who gives incriminating, but truthful, testimony. See Tweel, 550 F.2d at 298 (providing copies of tax returns). The reason for our concern in these cases is that the government should not use deceit to encourage a defendant to cooperate in a civil investigation during which he in essence incriminates himself. But where, as here, a defendant's own false testimony is used against him, we have no such concerns. After all, Skilling has not provided us with any justification for his lying under oath in a purely civil proceeding.

We therefore do not see a need to deviate from our general rule that, at sentencing, "a district court may conduct an inquiry broad in scope, largely unlimited either as to the kind of information it may consider, or the source from

which such information may come." Robins, 978 F.2d at 891. Accordingly, the district court did not err in using Skilling's SEC testimony at sentencing.

B.     Jeopardizing the Safety and Soundness of a Financial Institution

Skilling appeals the four-level enhancement for substantially jeopardizing the safety and soundness of a "financial institution" pursuant to U.S.S.G. § 2F1.1(b)(8)(A) (2000). He urges that the enhancement is incorrect for two reasons. First, he says that because the evidence at trial did not prove that his conduct caused Enron's bankruptcy, it was impossible to say that he substantially jeopardized any financial institution. Second, he posits that the Enron Corporation Savings Plan and the Employee Stock Ownership Plan (collectively the "Retirement Plans") are not "financial institutions" as that phrase is used in § 2F1.1, so the section cannot apply at all. Because we agree with the second contention, we do not reach the first.

We review the district court's decision that the Retirement Plans are "financial institutions" de novo, because it is an issue of law. United States v. Soileau, 309 F.3d 877, 878-79 (5th Cir. 2002). The Guidelines section at issue, § 2F1.1(b)(8), provides, "If the offense (A) substantially jeopardized the safety and soundness of a financial institution; . . . increase by 4 levels." As used in the Guidelines, "financial institution"

> is defined to include any institution described in 18 U.S.C. §§ 20, 656, 657, 1005-1007, and 1014; any state or foreign bank, trust company, credit union, insurance company, investment company, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," as used above, primarily include large pension funds that serve many individuals

(e.g., pension funds of large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

U.S.S.G. § 2F1.1 cmt. 19.

The definition does not explicitly mention retirement plans, such as the two at issue here, even though neither is a particularly novel retirement vehicle. The question is whether the Retirement Plans are "pension funds" or whether they fall into the "any similar entity" catch-all.

The government, relying on BLACK'S LAW DICTIONARY, argues that the Retirement Plans are in fact "pension funds." Black's does not define "pension fund" but does define "pension plan." The government equates these terms, and we see no reason not to do so as well. Black's defines "pension plan" in two ways:

> 1. Under ERISA, any plan, fund, or program established or maintained by an employer or an employee organization that provides retirement income to employees or results in a deferral of income by employees extending to the termination of employment or beyond. 29 USCA § 1002(2)(A).

> 2. Under the Internal Revenue Code, an employer's plan established and maintained primarily to provide systematically for the payment of definitely determinable benefits to employees over a period of years, usu. for life, after retirement.

BLACK'S LAW DICTIONARY 1170 (8th ed. 2004) (paragraph break added). This definition, unfortunately, is unhelpful in settling the dispute at hand, and the government tellingly cites only the ERISA portion.[85] There is no doubt that, under ERISA, the Retirement Plans are "pension funds," because employees contributed to them for the purpose of securing retirement income. On the other

---

[85] Contrary to the government's argument, Black's defines "pension" as "[a] fixed sum paid regularly to a person." BLACK'S LAW DICTIONARY 1170 (8th ed. 2004). This leads to the assumption that a pension fund, or pension plan, without any statutory gloss, would be a plan that promised a fixed sum at regular intervals. The Retirement Plans do not provide this.

hand, under the Internal Revenue Code, the plans were not established to pay "definitely determinable benefits," because these retirement accounts, by virtue of being unguaranteed equity investments, were highly variable: no one was guaranteed any rate of return. Nor is the elaboration of "[u]nion or employee pension fund," U.S.S.G. § 2F1.1 cmt. 19, helpful, because that definition still does not define "pension fund."

If the Retirement Plans are not "pension funds," another option is to determine whether the Retirement Plans fall into the Guidelines' "any similar entity" catch-all. In the government's favor, the definition lists mutual funds, which, like the Retirement Plans, also do not provide determined benefits.

This analogy is unhelpful, however, because the other examples in the definition, with the exception of "pension funds," which the Guidelines do not pellucidly define, are specific and individual financial entities. The definition speaks, inter alia, of entities that must be registered with the SEC or the Commodities Futures Trading Commission, banks, trust companies, and credit unions. U.S.S.G. § 2F1.1 cmt. 19. Additionally, we have already held that Medicare is not a financial institution, even though it might have features similar to some of the explicitly enumerated institutions, such as private insurance associations. See Soileau, 309 F.3d at 881 (holding that the enhancement should not apply because the definition does not explicitly mention Medicare). If anything, this cautions us against extending the definition without convincing evidence.

Under the government's position, any large corporation would become a financial institution just by virtue of providing its employees with a tax-sanctioned retirement account. If that account is a "pension fund," then placing that fund in jeopardy would, of course, lead to the application of this enhancement. We are unprepared to declare every corporate retirement vehicle a "financial institution."

Even if the government has presented a reasonable interpretation of the enhancement, the rule of lenity counsels that we must resolve any doubts in the interpretation of a criminal provision in favor of the defendant. United States v. Cuellar, 478 F.3d 282, 300 (5th Cir. 2007) (en banc) (Smith, J., dissenting), majority rev'd on other grounds, 128 S. Ct. 1994 (2008). Because both sides have made reasonable arguments as to the meaning of "financial institution," this case falls within the rule, and we resolve any doubts in favor of Skilling. The court therefore erred in applying this enhancement.

In sum, although the district court properly applied the obstruction of justice enhancement, it incorrectly applied an enhancement for substantially jeopardizing a "financial institution." Accordingly, we vacate Skilling's sentence and remand for resentencing.

## IX. Conclusion

Skilling failed to demonstrate that the government's case rested on an incorrect theory of law or that any reversible errors infected his trial. Accordingly, we AFFIRM Skilling's convictions in all respects. We VACATE Skilling's sentence and REMAND for resentencing.